**Earl and Gail NEWSOME, individually and as Sole Heirs of Jill Newsome, Appellants,**

v.

**CHARTER BANK COLONIAL, Formerly known as Colonial National Bank; Dr. Gerald W. Johnson; Houston Northwest Plastic Surgery Associates, P.A.; Houston Northwest Outpatient Surgery Center, Inc., Appellees.**

No. 14–95–00455–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Dec. 12, 1996.

Rehearing Overruled March 27, 1997.

Before MURPHY, C.J., and ANDERSON and O'NEILL, JJ.

## OPINION

MURPHY, Chief Justice.

This is a suit for damages arising out of a garnishment action. Earl and Gail Newsome ("the Newsomes") appeal from a judgment in favor of Charter Bank Colonial, Formerly Known as Colonial National Bank ("the Bank"). The Newsomes sued the Bank for conversion, fraudulent transfer, and conspiracy alleging that the Bank violated a writ of garnishment by failing to impound funds in certain accounts held in the names of the judgment debtors and third-parties. A jury rendered a verdict in favor of the Bank on all but one of the claims. After disregarding the jury's finding with respect to that claim, the trial court entered judgment for the Bank. The trial court's judgment does, however, award the Newsomes certain funds which were covered by the writ of garnishment and deposited in the registry of the court. On appeal, the Newsomes raise four points of error primarily attacking the sufficiency of the evidence. The Bank raises a cross-point contending that the trial court's judgment is erroneous insofar as it taxes all costs against the Bank and purports to deny the Bank's motion to disregard jury findings. The Bank also raises five other cross-points conditioned on whether this court sustains any of the Newsomes' points of error. We affirm as modified herein.

## I. FACTS

Many of the following procedural facts are stipulated. In February 1982, the Newsomes, on behalf of their daughter, obtained an $11.3 million medical malpractice judgment in the 133rd District Court of Harris County, cause no. 79–42525, against Dr. Gilbert W. Johnson, Houston Northwest Plastic Surgery Associates, P.A. and Houston Northwest Outpatient Surgery Center, Inc. (collectively "the medical malpractice defendants" or "the judgment debtors").[1] In April

Bobbie G. Bayless, Houston, for appellants.

Ben Taylor, Dallas, William J. Boyce, Lynne M. Gomez, Houston, for appellees.

---

1. Although the judgment debtors were named as parties to this suit, the Newsomes did not seek a new judgment against the judgment debtors and thus, they are not parties to this appeal.

1982, the Newsomes filed an application for writ of garnishment in the same court in cause no. 79–42525–A and served the writ of garnishment on the Bank. The writ identified only the medical practice defendants as the judgment debtors. Within the time required by law, the Bank answered that on the date of service and the due date of its answer, it was indebted to the judgment debtors in the total amount of $40.00. The Bank also answered that it did not know of any other parties who were indebted to, or who held "effects" belonging to, the judgment debtors. On May 21, 1982, Dr. Johnson filed for bankruptcy. As a result, the garnishment action was stayed until December 17, 1985, when the bankruptcy court entered its order denying Dr. Johnson's request for a discharge from his debts.

In April 1986, four months after the dismissal of the bankruptcy case, the trial court granted the Newsomes' request for turnover relief and appointed a temporary receiver for Dr. Johnson's medical practice, other business enterprises, and non-exempt assets. At the same time, the Newsomes filed another suit designated as cause no. 79–42525–H. In that suit, the Newsomes requested that certain conveyances made by Dr. Johnson and his wife be set aside and sought a judicial declaration that the medical malpractice judgment was a community debt. The Newsomes also sought injunctive relief to prevent the Bank and numerous other defendants from transferring assets to the judgment debtors. The court issued a temporary restraining order enjoining the defendants from releasing any assets that were held in the name of Dr. Johnson or his wife or over which they had signature authority. On June 4, 1986, the Newsomes settled what is referred to as "the injunction suit" with Dr. Johnson and his wife. The settlement agreement in part required Dr. Johnson to pay some of the Newsomes' outstanding medical bills and to make certain monthly payments on the Newsome judgment. In return, the Newsomes agreed to abate the turnover proceedings and to dismiss the injunction suit. Dr. Johnson also agreed to dismiss his malicious prosecution suit against the Newsomes' attorney. The settlement agreement, however, did not affect the garnishment action. On June 13, 1986, the court dismissed the injunction suit.

On January 10, 1987, Dr. Johnson's bankruptcy case was dismissed. In April 1987, almost five years after service of the writ of garnishment, the Newsomes began filing affidavits and pleadings in the garnishment action alleging that the Bank failed to fully disclose that it was indebted to third-parties related to the judgment debtors. In that regard, the Newsomes claimed that the Bank knew or should have known that Dr. Johnson was attempting to avoid garnishment by depositing income from his medical practice in accounts held in the name of his wife, other family members or employees, and that the Bank should have taken action to impound, or prevent the transfer of, these funds.[2] The Bank filed affidavits and pleadings denying these allegations and asserting that these third-parties were never named as judgment debtors in the writ of garnishment and that none of the judgment debtors were signatories to accounts held by these parties. The Bank also asserted that these accounts did not even exist until several years after the Bank was required to answer the writ.

On July 12, 1990, the Bank filed an interpleader action depositing $1,088.37 into the registry of the court. This amount includes additional indebtedness to one of the named judgment debtors at the time of service of the writ in the amount of $1048.37, which was uncovered by the Bank during discovery. In late 1994, after denying motions for summary judgment filed by both parties, the trial court called the case to trial. A jury found in favor of the Bank on all but one of the claims submitted. Both parties filed motions to disregard the jury's findings. In its judgment and modified judgment, the court recites that it denied the Bank's motion and granted the Newsomes' motion in part. However, with-

2. The Newsomes amended their petition no less than seven times. Each time they asserted a new cause of action or identified additional parties, who they alleged held accounts for the benefit of the judgment debtors at the Bank or to whom they alleged the Bank improperly transferred funds. The Bank filed corresponding answers, asserting several affirmative defenses and never waivering in its position that it fully complied with the writ of garnishment served upon it.

out explanation, the trial court awarded the Newsomes only the $1,088.37 deposited in the registry of the court, plus court costs. After the court overruled their motion for new trial, the Newsomes perfected this appeal.

## II. CONVERSION

In point of error one, the Newsomes challenge the legal and factual sufficiency of the evidence to support the jury's answer to question 7 relating to their conversion claim. The Newsomes contend the Bank's liability for conversion is established as a matter of law because the Bank violated the writ of garnishment by failing to impound funds held in accounts in the name of third parties, but which allegedly belonged to Dr. Johnson. They assert the Bank owed a duty to impound the funds in these accounts from the time Bank was served with the writ until further order of the court. The Bank contends that its duty to impound funds was limited merely to those funds held in accounts of the named judgment debtors on the date of service as well as any additional funds deposited in those accounts by the due date of its answer. Because it is uncontroverted that the Bank deposited those funds into the registry of the court, the Bank asserts it complied with the writ of garnishment and did not commit conversion as a matter of law. The Bank raised these issues in objections to the charge.

### A. Specific Chattel

▬▬ Conversion consists of the wrongful exercise of dominion or control over another's property in denial of, or inconsistent with, the other's rights. *Estate of Townes v. Townes,* 867 S.W.2d 414, 419 (Tex.App.— Houston [14th Dist.] 1993, writ denied). Money is subject to conversion only when it can be identified as a specific chattel, and not where an indebtedness may be discharged by the payment of money generally. *Id.* An action for conversion of money will lie where the money is (1) delivered for safe keeping; (2) intended to be kept segregated; (3) substantially in the form in which it is received or an intact fund; and (4) not the subject of a title claim by its keeper. *Id.* Here, the Bank contends the only funds that could be a specific chattel and subject to a claim of conversion were those captured by the writ of garnishment served on the Bank. The Bank is correct. The only question is what funds were captured by that writ of garnishment. That question can be answered by determining the Bank's duty as garnishee under the writ.

### B. The Garnishee's Duty
#### 1. Whose Funds Are Garnished?

In *Bank One, Texas, N.A. v. Sunbelt Savings, F.S.B.,* 824 S.W.2d 557, 558 (Tex.1992), the supreme court held that a bank served with a writ of garnishment may rely solely on its deposit agreement when determining the party to whom it is indebted. There, the judgment creditor obtained a writ of garnishment against a bank naming James C. Bramlett as the judgment debtor. 824 S.W.2d at 557–58. The writ did not, however, name Bramlett's corporation which had accounts at the bank. *Id.* Bramlett did not have accounts at the bank, but commingled his personal funds with the corporate funds in the corporate accounts. *Id.* at 558. As a result, the bank correctly answered the writ of garnishment stating that it was not indebted to Bramlett. *Id.* After Bramlett subsequently withdrew funds from the corporate accounts, the judgment creditor sought to hold the bank responsible for failing to impound funds held in the name of Bramlett's corporation. *Id.* Ruling in favor of the bank, the court stated:

Funds placed with a bank ordinarily become general deposits which create a debtor-creditor relationship between the bank and its depositor. (citation omitted) A garnishee bank is not indebted to a judgment debtor unless some form of deposit agreement creates a debtor-creditor relationship between the bank and the judgment debtor.

When a creditor wants to challenge title to funds held by a third party, the creditor should seek a writ of garnishment naming the nominal owner not the true owner. The court is then responsible for determining true ownership. Requiring a garnishee bank to determine true ownership of its

deposits improperly shifts a judicial responsibility to the garnishee.

*Id.*

■ The Newsomes point out that the writ of garnishment was served, and the Bank's answers were filed, long before the supreme court's opinion in *Bank One.* Assuming *Bank One* effected a change in the law, the court's decision applies retroactively. *See Bowen v. Aetna Casualty and Surety Co.,* 837 S.W.2d 99, 100 (Tex.1992) (per curiam) (a decision of the supreme court operates retroactively unless the court exercises its discretion to modify that application). However, it is not entirely clear that *Bank One* changed the law. Citing *Thompson v. Fulton Bag & Cotton Mills,* 155 Tex. 365, 286 S.W.2d 411, 414 (1956), the Newsomes assert that the law before *Bank One* required the garnishee to impound funds held in the names of third parties where the ownership of such funds was contested. As explained by *Bank One,* the existing law did not impose such a requirement:

> In [*Thompson*], we held that '[t]he scope of the inquiry in a writ of garnishment is broad enough to impound funds of the debtor, held by the garnishee, even though title thereto stands nominally in a third party.' [citation omitted] However, we were only addressing the scope of the jurisdiction of the court issuing the writ of garnishment when a garnishee chooses to pay into the court funds to which the third party holds nominal title. *Thompson* did not hold that the garnishee is required to pay into the court funds to which title is in a third party who is not named in the writ of garnishment. This is true even when there is a question of true ownership.[3]

*Bank One,* 824 S.W.2d at 558. (emphasis added)

■ Thus, it appears from the opinion that *Bank One* did not overrule existing law, but merely clarified it. *See id.* Although the Newsomes filed several controverting affidavits contesting the ownership of certain accounts, the Newsomes never applied to the court for, and never served, a writ of garnishment naming the third-parties whose names appeared on those accounts. *See Bank One,* 824 S.W.2d at 557–58; *see also Overton Bank And Trust v. PaineWebber, Inc.,* 922 S.W.2d 311, 313–14 (Tex.App.—Fort Worth 1996, no writ). It was the court's responsibility, not that of the Bank's, to determine the true ownership of the accounts in question. *See Bank One,* 824 S.W.2d at 557–58. Generally, a writ is "a judicial order to perform a specified act, or giving authority to have it done...." BLACK'S LAW DICTIONARY 1608 (6th ed.1990). Only a writ of garnishment ordering the Bank to account for its indebtedness to the third-parties in question would have compelled the Bank to impound the funds in such third-party accounts. The fact that Mrs. Johnson was identified in the application for the writ of garnishment is immaterial. *See Overton Bank,* 922 S.W.2d at 313–14.

Because the Newsomes never served a writ of garnishment naming Mrs. Johnson or any other third-party as a judgment debtor, the Bank's failure to impound funds held in accounts by such parties did not violate the writ of garnishment. *See Bank One,* 824 S.W.2d at 558. Furthermore, the Bank's obligation to impound funds under the writ extended only to those funds held by named judgment debtors on the date of service of the writ, plus any additional funds held by the named judgment debtors on the due date of the Bank's answer.

### 2. What Funds Are Garnished?

■ The writ of garnishment served on the Bank in this case followed the form suggested in Texas Rule of Civil Procedure 661. According to the Newsomes, that rule required the Bank to impound any funds deposited by the *judgment debtors during the pendency* of the garnishment proceeding. The Bank contends it was obligated to im-

---

**3.** Contrary to the Newsomes' contention, *Bank One* does not create any kind of exception for funds held in the name of a judgment debtor's spouse. Where the character or ownership of such funds is in question, the supreme court has clearly stated that a garnishee need not impound funds before the court determines ownership. *Bank One,* 824 S.W.2d at 558. To require otherwise, even where funds might belong to the community, would impermissibly shift the responsibility of determining ownership from the court to the garnishee. *See id.*

pound only those funds held in the accounts of the named judgment debtors on the date of service of the writ and any additional funds deposited in those accounts by the due date of its answer. The Bank relies on *Consolidated Gasoline Co. v. Jarecki Mfg. Co.*, 72 S.W.2d 351 (Tex.App.—Eastland 1934), *opin. adopted*, 129 Tex. 644, 105 S.W.2d 663 (1937).

In that case, the garnishee answered the writ some seven months after its answer was due. In the answer, the garnishee stated the amount it was indebted to the judgment debtor on the date of service and the due date of the answer. 72 S.W.2d at 351. The judgment creditor objected to the answer in part because it did not show additional indebtedness accruing up to the time the garnishee actually filed its answer. *Id.* After first recognizing that garnishment is purely a statutory remedy, the requirements of which must be "strictly pursued," the court observed that former article 4081 defined the duty imposed on the garnishee. *Id.* at 352; *see* Tex.Rev.Civ. Stat. Ann. art. 4081 (repealed 1939). Under that statute, according to the court, "the effect of the due service of a legal writ is to impound whatever indebtedness the garnishee owes the defendant at the time of the service of the writ, and also whatever additional indebtedness, if any, so owing at the time the garnishee is required by the writ to appear and answer." *Id.*

In holding that the garnishee was indebted to the defendant in the amount shown at the time of the due date of its answer, the court concluded that "the policy of the law to impound existing debts, rather than future accruing debts," which was reflected in the existing garnishment statutes and case law, was left unchanged by certain statutory amendments. The court recognized that the "whole duty of the garnishee is to answer upon the day commanded in the writ what, if anything, he is *then* indebted to the defendant and was when the writ served." *Id.* at 352–53 (emphasis in original). The court stated "that it is the writ of garnishment which measures the duty of the garnishee and the right of the plaintiff, and results in

the impounding of the indebtedness and *only such as the garnishee owes the defendant at the time the writ was served.*" *Id.* (emphasis added). The supreme court adopted the opinion of the court of appeals, concluding "that the questions presented were correctly decided by that court and that the reasons given for its holding are correct." 105 S.W.2d at 663.

The holding in *Jarecki* is perfectly consistent with the Rules of Civil Procedure relating to garnishment. Specifically, the form of writ suggested in Rule 661, like former article 4081 discussed in *Jarecki*, specifically commands the garnishee "to answer upon oath what if anything, you are indebted to the said [defendant], and were *when this writ was served* upon you...." *See* Tex.R. Civ. P. 661 (emphasis added); *see also* Tex.R. Civ. P. 668. The Newsomes ignore this language in the rule. Instead, they rely on cases that cite the following language of the rule:

> You are further commanded NOT to pay to defendant any debt or to deliver to him any effects pending further order of this court.

Tex.R. Civ. P. 661 (Vernon Supp.1996).[4]

Neither this quoted language nor the cases cited by the Newsomes, are pertinent to the issue decided in *Jarecki*; that is, what funds are actually captured by a writ of garnishment. Rather, that language and those cases deal with the garnishee's duty once funds are captured by the writ. *See Texas Commerce Bank v. Townsend*, 786 S.W.2d 53, 55 (Tex. App.—Austin 1990, writ denied) (holding that garnishee bank not liable for wrongful dishonor by failing to pay check presented by debtor on his trust account after service of writ but before answer date); *Industrial Indem. Co. v. Texas Am. Bank*, 784 S.W.2d 114 (Tex.App.—Fort Worth 1990, no writ) (holding that garnishee's appeal of prior judgment in favor of judgment debtor did not constitute unliquidated debt so as to preclude a judgment in favor of garnishor pursuant to writ of garnishment); *Collier Mfg. & Supply*

---

4. This language was added to the rule by order of the supreme court, effective January 1, 1978. Article 4084, now section 63.003 of the Civil Practices and Remedies Code, contains identical language. Article 4084 was in effect when *Jarecki* was decided and when the writ in this case was served.

*Inc. v. Interfirst Bank Austin, N.A.,* 749 S.W.2d 560 (Tex.App.—Austin 1988, no writ) (holding that garnishee bank violated equitable obligation to garnishor by paying garnished funds to debtor after writ of garnishment was erroneously dissolved); *Glassman & Glassman v. Somoza,* 694 S.W.2d 174 (Tex. App.—Houston [14th Dist.] 1985, no writ) (holding that garnishor failed to show that writ of garnishment issued on garnishee bank was erroneously dissolved); *Intercontinental Terminals, Co. v. Hollywood Marine, Inc.,* 630 S.W.2d 861 (Tex.App.—Houston [1st Dist.] 1982, writ ref'd n.r.e.) (holding that fact issue existed as to amount of garnishee's indebtedness to debtor at time of service of writ of garnishment); *Cohen v. Advance Imports, Inc.,* 597 S.W.2d 449 (Tex.App.—Dallas 1980, writ ref'd n.r.e.) (holding that garnishee was not liable for conversion in suit brought by debtor after garnishee refused to return debtor's merchandise following dissolution of only one of two writs of garnishment); *Westridge Villa Apartments v. Lakewood Bank & Trust Co.,* 438 S.W.2d 891 (Tex.App.—Fort Worth 1969, writ ref'd n.r.e.) (holding that garnishee who transferred garnished funds to intervenor during pendency of garnishment proceeding failed to establish defense to judgment favoring garnishor based on stipulations entered of record).

Clearly, none of these cases were decided on facts or issues similar to those disputed in this case. These cases do not overrule, limit, distinguish or even refer to *Jarecki* nor do they cite the pertinent language of the rule. Thus, *Jarecki* is still the law concerning what funds may be captured by a writ of garnishment. *See Matter of Bohart,* 743 F.2d 313, 324 n. 9 (5th Cir.1984) (noting that garnishment traps the indebtedness owed when the writ was served as well as that owed when the garnishee answers); *Baytown State Bank v. Nimmons,* 904 S.W.2d 902, 906 (Tex. App.—Houston [1st Dist.] 1995, writ denied) (stating that service of the writ of garnishment creates a lien on the judgment debtor's property, impounding the funds in the hands of the garnishee bank); *Rome Indus., Inc. v. Intsel Southwest,* 683 S.W.2d 777, 779 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.) (holding that a writ of garnishment not only impounds the funds held by garnishee when the writ is served, but also funds belonging to the debtor up to and including the day the garnishee is required to file its answer).

Accordingly, the only funds that were a specific chattel in this case were those held in the accounts of the named judgment debtors on the date of service of the writ as well as any additional funds deposited in those accounts by the due date of the Bank's answer. Because the Bank deposited those funds into the registry of the court, we hold that the Bank fully complied with the writ of garnishment and is not liable for conversion. Point of error one is overruled.

## III. FRAUDULENT TRANSFER

In points of error two and three, the Newsomes contend the trial court erred in failing to render judgment against the Bank for the transfer of funds by the judgment debtors to the Bank before and after September 1, 1987. Effective on that date, the Legislature replaced Chapter 24 of the Texas Business & Commerce Code with the Uniform Fraudulent Transfer Act ("the Act"). *See* Act of September 1, 1987, 70th Leg., R.S., ch. 1004, § 2 1987 Tex. Gen. Laws 3393, 3394 (current version at Tex. Bus. & Com.Code Ann. §§ 24.01–24.13 (Vernon 1987 & Supp.1996)). The Act contains new and different provisions than former Chapter 24. Because the transfers alleged to be fraudulent occurred both before and after the change, the trial court submitted the Newsomes' claim in two jury questions: one asking about transfers under former Chapter 24 and another asking about transfers under the new Act.

In answer to questions 1 and 2, the jury found the judgment debtors fraudulently transferred $1,577,052.00 to the Bank before September 1, 1987. In answer to questions 3 and 5, the jury found the judgment debtors fraudulently transferred $5,141,018.60 to the Bank after September 1, 1987. Because neither amount is included in the judgment, the trial court apparently disregarded these jury findings. However, the court's reasons for doing so are not entirely clear from the

record.[5]

 A jury finding must be disregarded when there is no evidence to support it or it is immaterial. *Spencer v. Eagle Star Ins. Co.*, 876 S.W.2d 154, 157 (Tex.1994). A question is immaterial when it should not have been submitted or when properly submitted, it is rendered immaterial by other findings. *Id.* The Bank raises several arguments in support of the trial court's ruling. In particular, the Bank argues that the trial court properly disregarded the jury's findings regarding fraudulent transfers because the Bank was not a "transferee." As a result, the Bank argues there was no "transfer." The Bank raised this issue in its objections to the charge.

Neither the former nor current fraudulent transfer statutes define a "transferee." However, the Fifth Circuit, in addressing the issue of avoidable transfers under the Bankruptcy Code, has defined a transferee as a party who has legal dominion or control over the funds; that is, the right to put the money to one's own use. *Matter of Coutee*, 984 F.2d 138, 141 (5th Cir.1993) (citing *Bonded Financial Services, Inc. v. European Am. Bank*, 838 F.2d 890, 893 (7th Cir.1988)). A party does not have dominion over the funds until it is "in essence, 'free to invest the whole [amount] in lottery tickets or uranium stocks,' if it wishes." *Coutee*, 984 F.2d at 141 (quoting *Bonded*, 838 F.2d at 894). Similar to the fraudulent transfer statutes in Texas, the Bankruptcy Code allows the bankruptcy trustee to avoid certain transfers. Specifically, section 547 of the Bankruptcy Code provides that a trustee may avoid a transfer made by a debtor to an existing creditor within ninety days before bankruptcy if the transfer enables the creditor to receive more than a designated share of the debtor's estate. *See Coutee*, 984 F.2d at 140; *see also*

11 U.S.C. § 550. Section 550(a)(1) provides that the bankruptcy trustee may recover a preference avoided under section 547 from the "initial transferee of such transfer." *See id.* Both *Coutee* and *Bonded* involve questions of "initial transferee" status under the Code.

In *Coutee,* a plaintiff's law firm arranged a loan for particular clients and acted as guarantor on the clients' note with the bank. *Id.* at 139. When the clients recovered a judgment, they endorsed the check to the firm, which deposited the funds into its trust account. *Id.* at 140. After taking its legal fees out of the funds, the firm paid off the loan to the bank and gave the remainder to the clients. *Id.* Within ninety days of payment of the note, the clients filed for bankruptcy and the trustee filed an action against the bank seeking to avoid payment of the note on grounds that it was a preference under section 547. *Id.* The bank argued the firm, not the bank, was the initial transferee. *Id.* The court disagreed, finding that the bank was the initial transferee of the loan proceeds.[6] *Id.* The court held that by depositing the funds from the judgment in its trust account for the benefit of its clients, the firm did not exercise dominion and control over those funds, and thus, was not an initial transferee under section 550(a)(1). *Id.* at 141. The court noted that an intermediary party that does not gain actual dominion and control over funds is "a mere conduit or agent." *Id.* at n. 3.

In *Bonded,* Ryan controlled a number of currency exchange businesses and owned a horse farm. 838 F.2d at 891. Ryan borrowed $200,000 from the bank to run the horse farm. *Id.* One of Ryan's currency exchanges sent the bank a check payable to the bank's order with a note directing the bank to "deposit this check into [Ryan]'s

5. Presumably, the trial court disregarded the answers to questions 3 and 5 because the jury found in question 4 that the Bank accepted the post-September 1, 1987, funds in good faith and for a reasonably equivalent value. *See* TEX. BUS. & COM.CODE ANN. § 24.009(a).

6. To prove that the Bank knew that Dr. Johnson was the source of funds in the third-party accounts in question, the Newsomes offered into evidence a financial statement, which was pre-

pared by the Bank on Dr. Johnson in 1987. The financial statement shows numerous loans from the Bank to Dr. Johnson and related third-parties during the course of this litigation. While the financial statement also shows partial repayment of these loans, the Newsomes never tried to establish what loan proceeds, if any, were fraudulently paid to the Bank so as to confer transferee status on the Bank under the holding in *Coutee*.

account." *Id.* After the bank complied, Ryan instructed the bank to debit his account by $200,000 to reduce the outstanding balance on the loan to the horse farm. *Id.* Ryan subsequently paid the loan in full and the bank released its security interest in the horses. *Id.* Less than a month after it sent the check to the bank, the currency exchange filed for bankruptcy. *Id.* The bankruptcy trustee then sought to avoid the initial $200,-000 transfer from the currency exchange to the bank. *Id.* Finding that the bank was merely a financial intermediary and received no benefit from the transaction, the court held the bank was not an initial transferee, but was bound to follow the instructions that came with the check, i.e, to pay Ryan. *Id.* at 893. In reaching this conclusion, the court stated:

> The potential costs of monitoring and residual risk are evident when the transferees include banks and other financial intermediaries. The check-clearing system processes more than 100 million instruments every day; most pass through several banks as part of the collection process; each bank may be an owner of the instrument or agent for purposes of collecting at a given moment. Some of these funds represent funds fraudulently conveyed out of bankrupts, yet the cost of checking back on the earlier transferors would be staggering.
>
> \* \* \* \* \* \*
>
> Exposing financial intermediaries and couriers to the risk of disgorging a fraudulent conveyance in such circumstances would lead them to take precautions, the cost of which would fall on solvent customers without significantly increasing the protection of customers.

*Id.*

◼◼◼ Here, the Bank fulfilled its duty to impound those funds held in accounts captured by the writ of garnishment. *See Jarecki,* 72 S.W.2d at 352–53. As to all other accounts not captured by the writ of garnishment, the Bank's duty was simply to pay funds as directed by its depositors and in accordance with applicable law and prudent banking standards. *See Mesquite State Bank v. Professional Inv. Corp.,* 488 S.W.2d

73, 75 (Tex.1973); *Upper Valley Aviation, Inc. v. Mercantile Nat'l Bank,* 656 S.W.2d 952, 955 (Tex.App.—Dallas 1983, writ ref'd n.r.e.). The Newsomes contend the Bank should have impounded the funds in some of these other accounts because it allegedly knew or should have known at the time that the funds actually belonged to Dr. Johnson. However, the Bank did not exercise "dominion or control" over these funds. *See Coutee,* 984 F.2d at 141; *see also Bonded,* 838 F.2d at 893.

While there is evidence that the Bank engaged in a number of imprudent transactions with Dr. Johnson, many involving third-party checks cashed with improper endorsements for large dollar amounts or on other bank accounts, the Bank did not own these funds or otherwise benefit from these transactions, but was simply complying with its depositors' instructions to pay Dr. Johnson. As such, the Bank was merely a "financial conduit or intermediary" in the collection process. *See Coutee,* 984 F.2d at 141, n. 3; *see also Bonded,* 838 F.2d at 893. Therefore, any knowledge the Bank might have had at the time of the various transactions about the source of funds in other accounts, an issue hotly contested at trial, would not have bestowed the Bank with dominion or control over such funds. As we stated, the Newsomes contested the ownership of these accounts by filing controverting affidavits, not by applying for another writ of garnishment. *See* TEX.R. CIV. P. 658, 673. Dr. Johnson was not a signatory to any of the third-party accounts in question. In the absence of another writ of garnishment capturing such accounts, the Bank was simply not obligated to determine the ownership of the accounts in question or to impound the funds held in these accounts. *See Bank One,* 824 S.W.2d at 558.

Because we hold that the Bank was not a transferee, there was no transfer giving rise to liability on the part of the Bank under the former or current fraudulent transfer statutes. Therefore, the fraudulent transfer questions should not have been submitted and the jury's answers to those questions were properly disregarded by the trial court. *Spencer,* 876 S.W.2d at 157. Points of error two and three are overruled.

## IV. CONSPIRACY

In point of error four, the Newsomes challenge the factual sufficiency of the evidence to support the jury's answer to question 6 relating to their conspiracy claim. Because the conspiracy claim is an issue where the Newsomes bore the burden of proof, the Newsomes properly raise a "great weight" challenge. In reviewing the Newsomes' "great weight" challenge, we must examine the entire record to determine if: (1) there is only "slight" evidence to support the finding; (2) the finding is so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust; or (3) the great preponderance of the evidence supports its nonexistence. *See Cropper v. Caterpillar Tractor Co.,* 754 S.W.2d 646, 651 (Tex.1988); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986) (per curiam); *Hickey v. Couchman,* 797 S.W.2d 103, 109 (Tex.App.—Corpus Christi 1990, writ denied). We may reverse and remand only if we conclude that the complained of finding or nonfinding is against the great weight and preponderance of the evidence. *See Cropper,* 754 S.W.2d at 651; *Cain,* 709 S.W.2d at 176.

In answer to question 6, the jury failed to find that the Bank engaged in a civil conspiracy with the judgment debtors to fraudulently transfer funds. The jury was instructed that "civil conspiracy means a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." The jury was further instructed that "to find civil conspiracy, each of the following elements must exist: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages that were proximately caused by the conspiracy, if any."

It is uncontroverted that Dr. Johnson attempted to avoid paying the Newsome judgment by "laundering" income from his medical practice through bank accounts held in the name of family members, employees or business associates. Although Bank officials were aware of Dr. Johnson's predicament, the issue for the jury was whether the Bank knowingly participated in Dr. Johnson's scheme. The great weight and preponderance of the evidence suggests that while the Bank may have engaged in imprudent banking practices, there was no conspiracy.

Dr. Johnson denied that he or any of his family members, employees or business associates talked to Bank employees or officers about hiding assets from the Newsomes. Dr. Johnson's testimony is supported by almost every witness in the case. Bill Terry, who was the Bank's former senior vice-president and Dr. Johnson's loan officer, testified that he never discussed with Dr. Johnson, his family, or employees any action to avoid paying the Newsome judgment. Terry testified there was never a plan or agreement with Dr. Johnson, his family or his employees to avoid paying the Newsome judgment. Robert Kramer, the Bank's former cashier who handled the writ of garnishment, testified that he had no knowledge of a conspiracy between Dr. Johnson and employees of the Bank to defraud the Newsomes out of collecting their judgment. The Bank's former president, Thomas Sooy, testified he was not aware of any conspiracy by employees of the Bank to defraud the Newsomes. Sooy flatly denied any conspiracy involving himself, Bank employees and Dr. Johnson to destroy banking documents or otherwise aid Dr. Johnson in avoiding the Newsome judgment.

Further, the Bank's expert, William Watkins, concluded that there could not have been a conspiracy based on the facts of this case. According to Watkins, an expert in bank fraud and conspiracy, a conspirator would not, as the case here, use other accounts at the very same institution where he was conspiring to withhold funds, nor would a conspirator put accounts in the name of family members. Watkins also testified that the number of people alleged by the Newsomes to be part of the conspiracy was too large. If there was a conspiracy, Watkins testified the conspirators would have kept the transactions under $10,000 so the bank could have avoided having to complete Currency Transaction Reports. While there were transactions of $10,000 or more, Watkins admitted that he had not actually seen any Currency Transaction Reports.

In any event, Watkins pointed out that one of the challenged cashiers checks drawn on the Bank was sent to Dr. Johnson's court-appointed receiver and that a conspirator would not use a bank that was paying money to a receiver. Watkins testified that the Bank complied with banking industry standards in response to the various court orders and never deviated from normal business practices. According to Watkins none of the transactions he reviewed were unusual or suspicious and he did not see anything in the case that would lead him to believe that the Bank acted in bad faith. Lastly, Watkins testified that because Dr. Johnson was not a significant depositor and because funds were deposited and then withdrawn quickly, the Bank had no motive, financial or otherwise, to engage in a conspiracy with Dr. Johnson.

Even the Newsomes' banking expert, William Smith, conceded that he had no knowledge of an agreement between the Bank and the Johnsons to defraud the Newsomes. While Smith stated that many of the transactions at issue constituted questionable or imprudent banking practices, he refused to say that the Bank acted in bad faith. While we do not detail all the evidence in the record, we cannot say, based on the evidence cited above, that the jury's failure to find a conspiracy is against the great weight and preponderance of the evidence. *See Ellis County State Bank v. Keever*, 888 S.W.2d 790, 794 (Tex.1994) (when affirming the trial court's judgment on sufficiency grounds, an appellate court is not required to set forth all of the evidence supporting the judgment). Point of error four is overruled.

## V. THE BANK'S CROSS–POINT

By cross-point, the Bank contends the trial court's judgment should be modified as follows: (1) to reflect that the court granted the Bank's motion to disregard jury findings; and (2) to tax costs against the Newsomes, rather than the Bank. We agree.

### A. The Bank's Motion To Disregard

■ In its motion to disregard, the Bank asserted in part that the jury's answers to

questions 2 and 5 regarding the amount of funds fraudulently transferred by the judgment debtors were immaterial. By refusing to award the Newsomes those amounts in its judgment, the trial court in effect disregarded those answers. However, the trial court's judgment erroneously recites that it denied the Bank's motion to disregard. Thus, the judgment should be modified to reflect that the trial court granted the Bank's motion in part.

### B. Costs

■ Texas Rule of Civil Procedure 131 provides in pertinent part: "the **successful** party to a suit shall recover of his adversary *all* costs incurred therein. . . ." Tex.R. Civ. P. 131 (Vernon 1979) (emphasis added). Rule 141 states: "the court may, for good cause, to be stated on the record, adjudge the costs otherwise than as provided by law or these rules." Tex.R. Civ. P. 141 (Vernon 1979). Thus, Rule 131 requires that the successful party to a suit recover costs from the adverse party, unless the trial court finds good cause to adjudge the costs otherwise and states its reasons on the record pursuant to Rule 141. *Howell Crude Oil Co. v. Donna Refinery Partners, Ltd.*, 928 S.W.2d 100, 112 (Tex.App.—Houston [14th Dist.] 1996, writ requested) (citing *Contemporary Health Management, Inc. v. Palacios*, 832 S.W.2d 743, 745 (Tex.App.—Houston [14th Dist.] 1992, no writ)). The proper standard for reviewing a trial court's good cause is to determine whether the trial court clearly abused its discretion. *Howell*, 928 S.W.2d at 112 (citing *Contemporary Health*, 832 S.W.2d at 746).

■ Here, the jury's verdict and the court's judgment vindicated the Bank's right to make the transactions which the Newsomes contended violated statutory duties or duties in tort. Thus, the Bank was the successful party.[7] *See Perez v. Baker Packers*, 694 S.W.2d 138, 143 (Tex.App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.) (a "suc-

---

7. The Newsomes' tort and statutory claims were the subject of this litigation. Thus, the fact the Newsomes recovered under the writ of garnish- ment does not alter the Bank's status as a successful party under Rule 131.

cessful party" is one who obtains a judgment of a competent court vindicating a civil claim of right). However, the trial court did not state the reasons for assessing costs contrary to the rule. In the absence of any explanation for its actions, the trial court abused its discretion in assessing costs against the Bank. *See Howell,* 928 S.W.2d at 112. Thus, the trial court's judgment should be modified to award all costs to the Bank. Accordingly, the Bank's cross-point is sustained. Having overruled the Newsomes' points of error, we need not reach the Bank's conditional cross-points.

The trial court's judgment is hereby modified to award all court costs to the Bank and to accurately reflect the trial court's ruling granting in part the Bank's motion to disregard jury findings. The remainder of the trial court's judgment is affirmed.