# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
April 1, 2011

No.  10-40313

Lyle W. Cayce
Clerk

TERRY L. HILL, STEVE GARVIN

Plaintiffs - Appellees

INSTITUTIONAL SECURITIES CORPORATION,

Plaintiff - Appellee Cross-Appellant

v.

THOMAS W. ANDERSON; RS GROUP TRUST COMPANY; A.J. WALKER; RETIREMENT SYSTEM DISTRIBUTORS, INC.,

Defendants - Appellants Cross-Appellees

Appeals from the United States District Court
for the Eastern District of Texas
USDC No. 4:07-CV-315

Before JONES, Chief Judge, and BENAVIDES, Circuit Judge and AYCOCK, District Judge.* **

EDITH H. JONES, Chief Judge:

This is an appeal from a judgment for tortious interference with business relations and conversion governed by Texas law.  Following a jury verdict,

---

* District Judge, Northern District of Mississippi, sitting by designation.

** Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No.  10-40313

Appellants filed a motion for judgment as a matter of law, which the district court granted in part and denied in part.  On appeal, each side challenges the portion of that ruling which it considers unfavorable.  We affirm in part, reverse in part, and render, holding that appellees did not prove a legally sustainable case for tortious interference, defamation/negligence, or conversion.

## I.

This case concerns 403(b) retirement savings accounts maintained for employees of Texas state universities and the various entities that administer them.  Three roles are relevant.  First, an account custodian registers with employers—in this case, public universities—to make withdrawals from employees' paychecks.  Employees cannot contribute to their 403(b) plan except through a registered account custodian.  Second, the account custodian uses a broker-dealer to purchase securities.  An investor might also maintain a direct relationship with the broker-dealer.  Third, the investing employee may choose to enlist the services of a financial advisor to aid in selecting investments.

Plaintiff-Appellee ISC is a broker-dealer.  For years, ISC worked with an account custodian called QUADS, which was the registered custodian for 403(b) accounts at a number of Texas universities.  Beginning in 2005, QUADS faced financial difficulty.  In 2006, QUADS terminated its relationship with ISC, and Terry Hill, ISC's president, relinquished his position on the QUADS board of directors.  The following year, the Maine Bureau of Financial Institutions forced QUADS into conservatorship.  The conservator hired RS Group to take over the business of QUADS.  In its new capacity, RS Group became an account custodian at each university with which QUADS was previously registered.  RS Group did not, however, establish a relationship with ISC or Steve Garvin, who was a financial advisor working with ISC and who had maintained a relationship with QUADS prior to the dissolution of its relationship with ISC.

No. 10-40313

Concurrently with QUADS's slide into conservatorship, ISC had been trying to attract the clients it previously shared with QUADS. ISC sent letters to these clients asking them to select a new account custodian, Mid-Atlantic Trust Company, in order to continue working with ISC and its affiliated advisors like Garvin. The parties have stipulated that a majority of ISC's clients requested transfer to another custodian in order to continue working with ISC. Although the record is unclear as to how many transfers QUADS completed before entering conservatorship, a number of them remained outstanding when RS Group took over as account custodian. As part of its agreement with QUADS, RS Group assumed responsibility for transferring accounts to other custodians if the clients so desired.

At trial, Appellees argued that RS Group impeded the transfer process in order to buy itself time to persuade investors not to switch custodians. To that end, RS Group sent a letter to its clients on May16, 2007, including those who had requested transfers, explaining that it was now serving as the account custodian for former QUADS clients. Additionally, representatives of RS Group and its affiliated broker-dealer, RSDI, contacted the universities' human resources offices to promote their services. Hill argued at trial that in the course of these meetings, RS Group's employees defamed him. The jury partially accepted this argument. It found that Thomas Anderson (an RS Group employee) defamed Hill, but it awarded no actual damages for the defamation. The jury exonerated the other RS Group employee alleged to have defamed Hill. None of the jury interrogatories asked about defamation of ISC.

Dissatisfied with the pace of the transfer process and eager to retain as many former clients as possible, ISC, Hill and Garvin filed suit alleging tortious interference with their business relationships, defamation, and conversion of fees. The jury returned a verdict favorable to the plaintiffs on virtually all counts. In response, RS Group moved for judgment as a matter of law, which the

No. 10-40313

district court granted in part and denied in part. It reversed the jury's $2,500,000 award on the question whether RS Group negligently harmed the plaintiffs and eliminated $400,000 of exemplary damages related to Hill's defamation claim. The district court left undisturbed the jury's award for intentional interference with existing business relationships and conversion. Hill does not challenge the conclusion that he was not entitled to exemplary damages in the absence of actual damages. Otherwise, the parties appeal each of the district court's decisions on the motion for judgment as a matter of law.

## II.

"We review *de novo* the district court's denial of a motion for judgment as a matter of law, applying the same standard as the district court." *Travelers Cas. & Sur. Co. of Am. v. Ernst & Young LLP*, 542 F.3d 475, 481 (5th Cir. 2008). Where that standard concerns the sufficiency of the evidence supporting a jury verdict, "[a] court should grant a post-judgment motion for judgment as a matter of law only when the facts and inferences point so strongly in favor of the movant that a rational jury could not reach a contrary verdict." *Allstate Ins. Co. v. Receivable Fin. Co.*, 501 F.3d 398, 405 (5th Cir. 2007) (internal quotations omitted). Where the appeal challenges the district court's interpretation of state law, review is *de novo*. *Baily v. Shell W. E&P, Inc.*, 609 F.3d 710, 725 (5th Cir. 2010).

## III.

### A. ISC's Tortious Interference Claims

Following the jury verdict in favor of ISC, the district court denied RS Group's motion for judgment as a matter of law and entered judgment in the amount of $434,000. According to the joint pre-trial order, ISC's tortious interference claim rests on RS Group's intentional delay in transferring accounts to Mid-Atlantic and other custodians who would continue to do business with

No.  10-40313

ISC and Garvin.  Neither Appellee predicates its tortious interference claim on anything other than RS Group's handling of account transfers.

Under Texas law, "to recover for tortious interference with a prospective business relation[,] a plaintiff must prove that the defendant's conduct was independently tortious or wrongful." *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001).  This requirement does not oblige the plaintiff to show that the defendant is guilty of a tort, but rather that "the defendant's conduct would be actionable under a recognized tort." *Id*.  To borrow an example from *Sturges*, a defendant is guilty of tortious interference if he makes a materially false statement about the plaintiff to a third party with whom the plaintiff has a business relationship. *Id*.  The statement constitutes "tortious conduct" even if other elements of fraud are absent (*e.g.*, the third party's reliance). *Id*.  Unless the defendant engages in conduct capable of giving rise to a tort, an action for interference with business relationships will not lie.[1]

Appellees present no argument on the existence of independently tortious conduct.  In neither of their briefs do they cite *Sturges* or confront the principle it expounds.  The only independently tortious conduct they identify is Anderson's defamation.  While defamatory statements could support a claim for interference with business relationships under some circumstances, they do not in this case. Appellees introduced no evidence linking Anderson's defamatory statements with RS Group's alleged delay in transferring accounts.  Only the latter forms the basis of ISC's tortious interference claim against RS Group.  Whatever harm Anderson's defamation of Terry Hill might have inflicted, it did not affect the pace of transfers from RS Group to Mid-Atlantic.  RS Group's conduct in

---

[1] The related tort of interference with a contract lacks the requirement of independently tortious conduct. *Coca-Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671, 690 (Tex. 2006). Here, both the pre-trial order and the jury interrogatories refer to interference with a business relationship.  ISC must therefore clear the higher threshold.

No. 10-40313

transferring accounts was not wrongful independent of its interference with Appellees' business relationships.  Absent any other allegations of tortious conduct, ISC failed to present evidence on this element of its interference claim. The omission is fatal, and the district court erred in denying RS Group's motion for judgment as a matter of law on this point.

A separate basis for reversing the judgement concerns ISC's inadequate showing of causation and damages.  Texas law requires the plaintiff in an intentional interference case to establish that the defendant's "intentional interference was the proximate cause of damage . . . ." *Weakly v. East*, 900 S.W.3d 755, 759 (Tex. App. 1995). If a plaintiff succeeds in establishing causation, he must also show with reasonable certainty the *amount* of harm caused: "There can be no recovery for damages that are speculative or conjectural." *U.S. Bank Nat. Ass'n v. Stanley*, 297 S.W.3d 815, 822 (Tex. App. 2009).  ISC failed to meet these standards.

In approving the jury's finding, the district court observed that "there was some evidence—which was largely not objected to on admission—to support the jury's verdict, and the court will not disturb these findings." Although Appellees presented some evidence to support their theory of causation and harm, the evidence was conclusory and failed to establish a budgetary baseline from which a reasonable jury could assess damages.  Indeed, the jury's award of $434,000 corresponds to testimony from ISC's executive vice president and chief compliance officer, Scott Hayes, who reached his estimate by comparing the "normal amount of time it should take . . . versus what we actually encountered." He did not, however, introduce evidence demonstrating the "normal" cost of administering account transfers.  On cross-examination, Hayes admitted that he did not compare expenses between the RS Group transfer process and those of a similar-sized process in 2006.

No.  10-40313

Concluding that RS Group's actions caused any additional expenditures requires, at a minimum, evidence of (1) the expenses in this case and (2) an estimate of what would be reasonable under the circumstances.  Without demonstrating that its costs exceeded the reasonable amount for conducting a transfer of this scale, ISC failed to meet its burden.  For the same reasons, the $434,000 award is speculative and therefore improper under Texas law.

## B.  Garvin's Tortious Interference Claims

According to the pre-trial order, Garvin's claims against RS Group parallel those of ISC.  Because he makes the same allegation of interference with business relationships, Garvin stumbles on the same failure to identify independently tortious conduct.  His problems in establishing causation are equally fatal.

The divorce between QUADS and ISC caused most—if not all—of Garvin's damages, but it predated RS Group's involvement in the case by approximately one year.  Garvin admitted that he lost the vast majority of his customers when QUADS terminated its relationship with ISC.  In response to questioning by the district court, Garvin stated that without a relationship with QUADS in 2006 and 2007, "I would have to look for another approved vendor . . . ."  RS Group could not have caused whatever damages Garvin suffered as a result of QUADS and ISC parting ways.

This oversight regarding causation also infects the jury's calculation of damages.  Garvin's testimony concerning damages stated only that his fees at the University of North Texas "varied year to year, but I would probably say about 150,000 from UNT."  An estimate of total fees is insufficient, however, when RS Group caused much less than all of Garvin's loss.  At the very least, the $150,000 figure would seem to impose a cap on the amount he could recover.  Instead, the jury awarded $260,000.  In his briefing on appeal, Garvin defends his award as the sum of his lost fees and "approximately $45,000 - $52,500 per

No. 10-40313

year . . . as a result of the conduct of Anderson." This argument is no help, however, because the jury found that Anderson defamed only Terry Hill. Moreover, as explained above, the jury saw no evidence linking defamatory statements about Hill with delay in transferring accounts.

RS Group deserves judgment as a matter of law on Garvin's tortious interference claim for two reasons. First, the missing element of independently tortious conduct discussed above applies here as well. Second, Garvin's business relationships had already ended when Appellants delayed transferring accounts to other custodians. Either of these reasons supports the conclusion that it was error for the district court to enter judgment in Garvin's favor on tortious interference.

### C. Defamation

In coss-appeal, ISC argues that the district court erred in granting Appellants' motion for judgment as a matter of law on its defamation claim. Although allegations of defamation of ISC appear in the pre-trial order, they did not reach the jury. No jury interrogatory asked whether anyone defamed ISC. Appellees maintain, however, that defamation was the unnamed cause of action behind the negligence interrogatory on which the jury awarded ISC $2,500,000.[2] We are skeptical that negligence ever referred to defamation, but even assuming it did, the jury's findings did not establish all the elements of defamation.

The connection between negligence and defamation is tenuous and seems unique to this appeal. In the pre-trial order, ISC invoked negligence as a theory

---

[2] The jury interrogatory that ISC would construe as raising the issue of defamation stated: "Do you find by a preponderance of the evidence that the negligence, if any, of those named below proximately caused harm to INSTITUTIONAL SECURITIES CORPORATION?" In contrast, the district court included conventional defamation interrogatories regarding Terry Hill. These jury questions began by identifying a set of statements and defining defamation. They then expressly asked about the offense: "Do you find that the statements listed in Question G were defamatory concerning Terry Hill?" The jury faced no similar questions or instructions about ISC.

of liability unconnected to defamation.  The order stated that RS Group had "a common law duty to accomplish [account] transfers, as requested by the account owners . . . .  The conduct of RS Group, as described herein, was a breach of that duty of care and caused material financial loss to ISC because of the unnecessary amount of work caused by RS Group for which ISC now sues."  In closing arguments, counsel for Appellees again connected negligence with the delay in transferring accounts: "[RS Group] made these transfers come to a screeching halt.  As a result of that, it cost ISC a lot of money and a lot of trouble with respect to their customers.  And that's nothing but negligence."[3]  Finally, the district court understood ISC's negligence argument to relate to the process of transferring accounts.  In granting RS Group judgment as a matter of law, the court spoke exclusively in terms of the transfer process.  It explained that "any duty of care, if such existed, ran to the account holders, not Plaintiffs."  The court added several alternative grounds for its holding (*e.g.,* economic loss rule, speculative nature of damages), each of which confirms that the district court understood negligence with reference to account transfers rather than defamation.  In light of numerous discussions of negligence in connection with account transfers, it is hard to credit counsel's claim at oral argument that "[t]he jury knew exactly what was going on.  They knew that . . . we were arguing the defamation on behalf of ISC.  They understood that.  *There was no other negligence in the record.*"  (emphasis added).

As a substantive matter, the district court correctly held that any duty that RS Group might have breached ran exclusively to the account owners. Despite the assertion that "ISC was requested by a great majority of the account

---

[3] Defense counsel likewise addressed negligence only in the context of delayed transfers: "Let's talk about the negligence question, because Mr. Springer specifically addressed that. . . . You've heard no testimony of what would be expected coming out of other conservatorships with trust companies, what -- what that process should be, what the delay should be."

No.  10-40313

owners to act for . . . the account owner in accomplishing the transfers," ISC has no right to press negligence claims on their behalf.

Even assuming the negligence jury question was a camouflaged component of ISC's defamation claim, the jury's affirmative response is insufficient to establish RS Group's culpability.  Texas law allows a cause of action for defamation where the defendant: (1) published a statement, (2) that was defamatory as to the plaintiff, (3) "while acting with either actual malice, if the plaintiff was a public official or public figure, or negligence, if the plaintiff was a private individual, regarding the truth of the statement."  *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998).  RS Group does not dispute that ISC is a private entity or the resulting negligence threshold for fault.  Under these circumstances, negligence appears in the formula for defamation, but so do other elements.  The interrogatory to which the jury responded affirmatively says nothing about (1) the statement in question, (2) publication, (3) whether the statement was defamatory, and (4) the connection between negligence and truth or falsity.  ISC cannot import the missing elements from the jury's conclusions in Questions G through L, as those findings related to Terry Hill alone, not his company.  Finally, as the district court observed, "there was absolutely no evidence that anyone in this case had been damaged by the amount rendered by the jury."  Our review of the record confirms that the jury's award of $2,500,000 was speculative.

Only on appeal has the jury's finding of negligence on the part of RS Group been asserted to have a connection to defamation.  Conventionally, defamation would have been its own question for the jury.  If, as ISC's counsel maintained at oral argument, the district court refused to include such an instruction, then ISC had the responsibility to object and, if necessary, appeal the denial of their requested jury instructions.  FED. R. CIV. P. 51.  Instead, ISC attempts to shoehorn defamation into general negligence.  But defamation is larger than

No.  10-40313

negligence.  It includes other elements, which the jury did not find.  Moreover, no rational jury could connect (unidentified) statements by RS Group with $2,500,000 in damages to ISC.  For these reasons, RS Group was entitled to judgment as a matter of law on negligence.

### D.  Conversion

The district court entered judgment in favor of ISC on its conversion cause of action.  Although the contours of conversion are difficult to define, the payments in question are most akin to commissions and therefore ineligible for conversion under Texas law.

Conversion under Texas law requires that the plaintiff owned or had a legal right to possess some property, over which the defendant unlawfully assumed control, to the exclusion of the plaintiff's rights.  *J.P. Morgan Chase Bank, N.A. v. Tex. Contract Carpet, Inc.*, 302 S.W.3d 515, 536 (Tex. App. 2009) (listing elements).  Not all property can support an action for conversion, however.  "Money is subject to conversion only when it is a specific chattel, and not where an indebtedness may be discharged by the payment of money generally."  *Newsome v. Charter Bank Colonial*, 940 S.W.2d 157, 161 (Tex. App. 1996).  Examples of money as a specific chattel include funds "delivered for safe keeping" or money "intended to be kept segregated."  *Id.*  One class of money payments that are not a specific chattel are commissions earned by an employee.  *Wheat v. Am. Title Ins. Co.*, 751 S.W.2d 943, 944 (Tex. App. 1988); *see generally* 15 Tex. Jur. 3d *Conversion* § 21 (2011).

In the present case, ISC succeeded in its claim that RS Group converted so-called "12b-1 fees."  Those fees, paid by investment companies, reward broker-dealers who steer clients toward the companies' funds.  Because the 12b-1 fees operate as a reward for generating business, they are most akin to commissions, which *Wheat* concluded are not a specific chattel.  The district court did not analyze the specific chattel requirement and appears unconcerned with the

chattel-versus-debt taxonomy: "No matter what label is attached to them, the commissions belonged to Plaintiffs . . . ." Appellees do not contest their debt, but merely its characterization as conversion. Amy Morneweck, an RS Group employee familiar with 12b-1 fee payments, responded affirmatively to the following question: "RSDI ended up with a substantial amount of broker-dealer fees that should -- should have been paid to Mr. Hill . . . . Is that what you're saying?" Even if RS Group owes ISC the amounts it received in 12b-1 fees, it is not guilty of conversion.

Texas law provides a cause of action for conversion only where the defendant takes a specific chattel. Because general debts are not claims to specific funds, Appellees have the better argument on conversion. The withheld 12b-1 fees should be treated as a general debt.

## IV.

Several nuances of Texas law resolve the issues in this case. First, tortious interference with business relationships requires a showing of independently wrongful conduct. We therefore REVERSE the district court's denial of judgment as a matter of law on both ISC's and Hill's claims of tortious interference with business relationships. We likewise REVERSE the entry of judgment in favor of ISC on the issue of conversion, holding that 12b-1 fees are not specific chattels and thus ineligible for conversion under Texas law. Finally, we AFFIRM the district court's refusal to enter judgment on the jury's negligence verdict. In sum, Terry Hill, Steve Garvin and ISC take nothing from the defendants.

**Affirmed in part, reversed in part, and rendered.**