In The

Court of Appeals

For The

First District of Texas

____________

NO. 01-00-00789-CV

____________


AMERICAN NETWORK LEASING CORPORATION AND

ELECTRONIC DATA SYSTEMS CORPORATION, Appellants


V.


CORPORATE FUNDING-HOUSTON, INC., Appellee


* * *


CORPORATE FUNDING-HOUSTON, INC., Appellant


V.


AMERICAN NETWORK LEASING CORPORATION AND

ELECTRONIC DATA SYSTEMS CORPORATION, Appellees






On Appeal from the 157th District Court

Harris County, Texas

Trial Court Cause No. 92-29604






O P I N I O N

 This dispute arises out of a partnership between American Network Leasing
Corporation and its parent company, Electronic Data Systems Corporation, (collectively,
EDS) and Corporate Funding-Houston, Inc. (CFH). Trial was to the court, which awarded
damages in favor of CFH upon factual findings of fraud, negligent misrepresentation, and
breach of fiduciary duty. Damages were also awarded to EDS upon factual findings of
breach of agreement to pay a promissory note and conversion. The award to CFH exceeded
the award to EDS. Each party appeals that portion of the judgment rendered against it. We
affirm the judgment in part, reverse in part, and remand the cause for further proceedings. 

BACKGROUND


 In January 1988, CFH and EDS signed a partnership agreement for the purpose of
operating a business to lease "small ticket" business equipment. (1) Under the agreement, EDS
was to own a 99% interest in the partnership and would provide 99% of the cash needed to
purchase the equipment to be leased. CFH was to own a one-percent interest in the
partnership, provide one percent of the cash, and manage the partnership's lease portfolio. 
The term of the partnership, as specified in the agreement, was 30 years. The agreement
provided for two methods of distribution of assets upon termination of the partnership: (1)
if CFH was in default of the agreement, EDS would pay to CFH any balance in CFH's capital
account and would transfer CFH's interest in the partnership to EDS and (2) if CFH was not
in default, CFH would receive its share of the fair market value of any remaining partnership
assets. 

 On the same day CFH and EDS signed the partnership agreement, they also signed
an agent agreement in which CFH agreed to act as the partnership's agent by originating new
leases, collecting and paying sales and use taxes, and guaranteeing to EDS the full
performance of any lease CFH originated and the prompt payment of all lease receivables. 
In return, EDS was to pay CFH a one-percent guarantee fee based upon the cost of leased
equipment. 

 The procedures to be followed by CFH in performing its duties were set out in a
document entitled Standard Operating Procedures (SOPs). These SOPs were promulgated
by EDS and were amended by it on several occasions. The SOPs were referenced in the
partnership agreement and the agent agreement. 

 According to the SOPs at the time the partnership agreement was executed, CFH was
to deposit the lease payments into a bank account, and, three times a month, funds were
moved by electronic transfers, or "sweeps," from CFH's partnership account to EDS's
account. The amount of money to be transferred was determined by EDS based on figures
derived from EDS's lease tracking system. The lease tracking system did not record
payments on a lease-by-lease basis, but on a gross-receipts basis. The data in the lease
tracking system was supplied to EDS by a third-party network management company, using
information supplied by CFH, and was entered into the system by EDS's employees. This
procedure resulted in discrepancies between EDS's and CFH's records, with EDS's records
showing account deficits, which CFH disputed. The primary reason for the inflated deficits
appeared to be the failure of EDS's employees to input correct lease-termination data. EDS
does not deny that the lease tracking system contained incorrect data at least until 1991. In
early 1991, EDS began a process of reconciling the lease-termination data in the lease
tracking system, working with records provided by CFH.

 In mid-1990, a dispute arose between EDS and CFH regarding CFH's payments to
EDS and CFH's bank deposits. Employees at CFH were, at that time, depositing receipts in
Klein Bank in what EDS has characterized as "a secret account." EDS considered the funds
deposited in this account to be stolen. On the other hand, CFH considered the Klein Bank
account to be a depository for the collected receipts until they would be "swept" into EDS's
account. 

 In July 1990, EDS presented CFH with a promissory note in the amount of $593,380,
which EDS represented as the amount of the deficiency owed by CFH. Most of the amount
in the note was based on records of the lease tracking system, with the remainder of the note
being an alleged arrearage in tax payments due. EDS demanded that Glen Graves, the
president of CFH, sign a 90-day note and personally guarantee it. Graves complied with this
request. However, neither CFH nor Graves made any payments on the note. 

 On December 28, 1990, EDS terminated CFH's interest in the partnership, contending
that CFH was in breach of the partnership agreement because it was still behind in its
payment obligation. EDS also terminated CFH as agent for the partnership. However, EDS
did not effect a liquidation of the partnership, and CFH continued to administer the leases
entered into before the termination. 

 Because EDS claimed that the termination was due to CFH's default, EDS claimed
that it succeeded to all partnership rights and interests, including ownership of the leases, and
was required to give CFH only the positive balance of CFH's capital account. EDS
calculated CFH's positive balance as $242,595 and paid that amount to CFH by means of an
offset against the amount CFH owed to EDS, according to EDS's calculations. (2) 

 Following the termination of CFH's interest in the partnership, EDS imposed a
different set of procedures for depositing the lease receipts. All receipts collected by CFH
were to be deposited directly into EDS's bank account, and EDS provided CFH with a
monthly operating fund of $30,000 to cover salaries and expenses. In March 1991, EDS
reduced CFH's monthly operating fund to $10,500. Also in March, two employees of CFH
began depositing some of the receipts they collected into the Klein Bank account without the
knowledge of EDS. During this time, EDS placed one of its employees in CFH's offices to
assist with lease receivables, credit, and collections. EDS discovered the deposits made to
the Klein Bank account and again characterized them as theft. CFH characterized the
deposits as the retention of jointly-owned funds that were needed to pay salaries and
expenses. 

 In August 1991, Roderick Wilkins, an attorney and employee of EDS, along with two
other EDS employees, met with CFH, informed CFH that CFH owed EDS approximately $1
million, and presented a mutual release, for the signature of Glenn Graves, CFH's majority
shareholder, in which CFH and EDS each released the other from any liability arising out of
the partnership activities or activities associated with the collection of accounts in the lease
portfolio. Under this release, the lease portfolio and all assets of the partnership were to be
transferred to EDS, and CFH was to transfer all its interest in the residuals to EDS in
exchange for the forgiveness of its indebtedness arising under the partnership. Graves
testified that during this meeting, the EDS representatives alluded to the possibility of
criminal prosecution and said that CFH employees should be in jail. In an early draft of the
release, EDS reserved the right to pursue any criminal prosecution, but that reservation was
removed at Graves's insistence. Graves also testified that, in a later telephone conversation
on the day of the meeting, Dave Smith, one of three EDS representatives at the meeting, told
Graves that Graves needed to sign the release and that all Graves's employees were crooks
and should be in jail, including Graves's son. Graves signed the release a few days after the
meeting. 

 In July 1992, CFH sued EDS, alleging several causes of action, including breach of
contract, fraud, and breach of fiduciary duty. In 1993, another CFH employee deposited a
total of $8,000 from the lease payments to the Klein Bank account.

 In 1994, the parties engaged in court-ordered mediation, which did not result in a
settlement. The parties resumed negotiations in 1995, and, in a letter addressed to the
mediator and dated September 13, 1995, counsel for CFH stated, 

 [A] settlement of all litigation among and between [CFH and EDS] has been
agreed. [EDS has] agreed to pay the total sum of $2,500.00 to settle the claims
against them. All litigation . . . will be dismissed with prejudice and mutual
global releases will be executed and exchanged. 


 . . . I wanted to be sure that there was no misunderstanding and that our
settlement includes the suit on file in [another] court against Glen Graves and
Corporate Funding, Inc. . . . 


 . . . I would appreciate it if you would make it plain . . . that the
paperwork in this case needs to be simple motions and orders of dismissal with
prejudice and simple mutual global releases. What I envision [is] releasing
each other for all causes of action, claims, etc. from the beginning of time until
the day of the release. 


 Finally, . . . we would expect releases for Glen Graves, Jr., Corporate
Funding, Inc., Corporate Funding Houston Inc., and the officers, directors,
agents, representatives and employees of these companies. While I am not
able to be quite as specific, we would expect to furnish releases for the benefit
of [EDS] and their officers, . . . . 


 Thank you for your assistance. 


The appellate record does not contain any motions to dismiss the two referenced lawsuits. 
On September 21, 1995, EDS filed a notice of a rule 11 agreement with the trial court,
attaching a faxed copy of CFH's letter to the mediator. This notice asked the trial court to
take notice of the agreement entered into between counsel as described in the attached letter. 
EDS filed a motion for summary judgment to enforce the "settlement agreement," and the
motion was denied. 

 The case was tried to the court in 1998. Because of a bankruptcy stay, the judgment
was not signed until May 15, 2000. Upon request, the trial court made findings of fact and
conclusions of law. Both parties filed notices of appeal.


DISCUSSION


I. EDS'S APPEAL

 A. The 1995 Settlement

 In its first issue, EDS contends the trial court erred in (1) denying EDS's motion for
summary judgment asking the trial court to enforce the 1995 mediated settlement agreement
and (2) granting CFH's motion for summary judgment asking the trial court to render a take-nothing judgment on EDS's counterclaim that CFH breached the 1995 settlement agreement. 
EDS argues that the letter to the mediator, signed by counsel for CFH, is enforceable as an
agreement under rule 11 of the Texas Rules of Civil Procedure or, in the alternative, as a
contract, consistent with section 154.071 of the Texas Civil Practice and Remedies Code,
because the agreement is evidenced by a writing (the letter) and was signed (by counsel for
CFH) and filed with the court (by EDS) with a notice of rule 11 agreement signed by counsel
for EDS. EDS argues that the phrase, "has been agreed," in the letter to the mediator shows
that a meeting of the minds had already occurred. 

 Summary judgment is proper only when the movant establishes that there is no
genuine issue of material fact and that the movant is entitled to judgment as a matter of law. 
Randall's Food Mkts., Inc. v. Johnson, 891 S.W.2d 640, 644 (Tex. 1995); Lawson v. B Four
Corp., 888 S.W.2d 31, 34 (Tex. App.--Houston [1st Dist.] 1994, writ denied). In reviewing
a summary judgment, we must indulge every reasonable inference in favor of the nonmovant
and resolve any doubts in its favor. Johnson, 891 S.W.2d at 644; Lawson, 888 S.W.2d at 33. 
We will take all evidence favorable to the nonmovant as true. Id. As movant, the defendant
is entitled to summary judgment if the evidence disproves as a matter of law at least one
element of each of the plaintiff's causes of action. Tex. R. Civ. P. 166a(c); Lear Siegler, Inc.
v. Perez, 819 S.W.2d 470, 471 (Tex. 1991); Marchal v. Webb, 859 S.W.2d 408, 412 (Tex.
App.--Houston [1st Dist.] 1993, writ denied). 

 Because the judgment does not specify the ground relied on, we will affirm the
summary judgment if any theory advanced in the motion for summary judgment and
preserved on appeal is meritorious. See State Farm Fire & Cas. Co. v. S.S., 858 S.W.2d 374,
380 (Tex. 1993). 

 The requirement that a rule 11 agreement be in writing is analogous to the requirement
of the statute of frauds that certain agreements be in writing. Padilla v. LaFrance, 907
S.W.2d 454, 460 (Tex. 1995). "To satisfy the statute of frauds, 'there must be a written
memorandum which is complete within itself in every material detail, and which contains all
of the essential elements of the agreement, so that the contract can be ascertained from the
writings without resorting to oral testimony.'" Id. (quoting Cohen v. McCutchin, 565 S.W.2d
230, 232 (Tex. 1978)). However, the writing does not have to be a single instrument. Id. 

 The language of EDS's letter to the mediator does not contain all of the essential
elements of an agreement between EDS and CFH. The letter clearly indicates that the
mediator's assistance is required to finalize details important to the agreement, such as the
motions to be filed, the scope of the releases, and a clear understanding that two suits--not
just one--will be included in the settlement. EDS contends that it drew up drafts of releases,
which it submitted to CFH; that CFH requested certain changes in the releases; and that EDS
made the requested changes. However, EDS does not direct us to any document or series of
documents showing that the parties reached an agreement on the motions to be filed, the
releases to be signed, or the dismissal of the second lawsuit by EDS. 

 Because the letter from CFH's attorney to the mediator does not, on its face, show all
the essential elements of the agreement, the trial court did not err in granting CFH's motion
for summary judgment and denying EDS's motion. Accordingly, we overrule EDS's first
issue. 

 B. The 1991 Release

 In its second issue, EDS contends that the trial court erred in rescinding the 1991
release because EDS conclusively established that CFH had unclean hands. In this same
issue, EDS contends that the evidence is legally and factually insufficient to support the trial
court's findings of fact numbers 18 (that EDS misrepresented that CFH had a deficit of $1
million and that there was no chance that the alleged "deficit" could be satisfied from the
partnership revenues), 19 (that EDS threatened criminal prosecutions of persons connected
with CFH to coerce CFH to execute the release), and 20 (that EDS's fraud, breach of
fiduciary duty, and other wrongful conduct caused CFH to execute the release, caused actual
damages to CFH, and evidenced ill will, spite, and evil motive on the part of EDS). EDS
also challenges the legal and factual sufficiency of the evidence to support conclusion of law
number 3, which concluded that EDS committed fraud against CFH and caused actual
damages to CFH, and conclusion of law number 6, which concluded that CFH was excused
from the August 1991 release due to the duress and fraud of EDS. 

 In its findings of fact relating to CFH, the trial court found that CFH deposited
partnership funds in a CFH bank account in September 1990, March 1991, and April 1991;
that these funds totaled $105,275.78 (finding number 22); that these funds were converted
by CFH for its own use (finding number 23); and that the conversion was intentional, willful,
wanton, and malicious (finding number 24). EDS argues that these findings establish that
CFH had unclean hands and therefore may not be granted the equitable relief of rescission. 
We must determine whether there is sufficient evidence to support the trial court's findings
of fraud and coercion and whether the clean-hands doctrine should apply to deny relief to
CFH.

 To obtain an equitable remedy such as rescission, a party must come into court with
clean hands. Grohn v. Marquardt, 657 S.W.2d 851, 855 (Tex. App.--San Antonio 1983,
writ ref'd n.r.e.). The determination of whether a party has come to court with clean hands
is left to the discretion of the trial court. Id. "The doctrine cannot be used as a defense if the
unlawful or inequitable conduct of the plaintiff is merely collateral to the plaintiff's cause
of action." Id. The doctrine is applied to a party whose own conduct in connection with the
same transaction has been unjust or marked by a want of good faith. Jackson Law Office,
P.C. v. Chappell, 37 S.W.3d 15, 27 (Tex. App.--Tyler 2000, pet. denied). "If the party
seeking relief is not a free moral agent and the party's consent to the transaction in dispute
is obtained through duress or undue influence, the clean hands doctrine will not be used to
deny equitable relief to set the transaction aside." Grohn, 657 S.W.2d at 855. The judgment
of a trial court granting an equitable remedy should not be disturbed in the absence of a
showing that an inequity resulted. Jackson Law Office, 37 S.W.3d at 27. 

 CFH's conversion of funds was not a part of the same transaction in which EDS's
fraudulent representations regarding CFH's alleged deficit were made. At most, the
conversion is collateral to the transaction in which EDS made representations for the purpose
of obtaining Graves's signature on the release. Moreover, CFH has not shown that an
inequity resulted from the rescission of the release. We conclude that, under these facts, the
clean-hands doctrine will not deny CFH its relief. 

 We review EDS's evidentiary challenge under the usual standard for legal and factual
sufficiency review. Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983) (legal
sufficiency); Plas-Tex, Inc. v. United States Steel Corp., 772 S.W.2d 442, 445 (Tex. 1989)
(factual sufficiency). 

 Regarding the evidence to support the findings relating to EDS's fraud in numbers 18
and 20, EDS does not deny that there were inaccuracies in its lease tracking system, nor does
it claim that the representation of a $1 million deficit in August 1991 was accurate. Rather,
EDS contends that CFH did not establish fraud because it did not show reliance on EDS's
representations. EDS argues that Graves did not believe EDS's computations and also knew
that the lease tracking system was inaccurate and, therefore, CFH did not rely on EDS's
representations. 

 Although there is some evidence that Graves believed that the lease tracking system
was inaccurate, there is also evidence that CFH did not have all the necessary data to
calculate whether, and to what extent, there was a deficit in its account. By August 1991,
EDS had control of the payments made by the lessees and retained the portion that belonged
to CFH as payment on CFH's deficit. (3) CFH had no choice but to rely on EDS's
representations regarding the amounts CFH owed to EDS. 

 EDS also argues that statements made by EDS employees, in the meeting with Graves,
that there was no chance the deficit could be satisfied from the revenues of the partnership
was a statement of an opinion that cannot form the basis of a fraud claim. In addition, EDS
argues that the statement speaks to the future, making it a statement of opinion, not of fact. 

 Wilkins told Graves in August 1991 that CFH had a deficit of approximately $1
million and that he did not think CFH would ever be able to pay it back. He did not give
Graves any information about CFH's capital account or CFH's share of the projected
residuals and stream fees. (4) 

 Although statements of opinion generally cannot support a claim for fraud, statements
of opinion may support an action for fraud when (1) the speaker knows the statement is false,
(2) the statement is an opinion as to the happening of a future event, and (3) the opinion is
based on past or present facts. Paull v. Capital Res. Mgmt., Inc., 987 S.W.2d 214, 219 (Tex.
App.--Austin 1999, pet denied). 

 In this case, there is evidence that EDS knew (1) the deficit calculation was incorrect
and (2) to the extent there was a deficit, the residual and stream fees were sufficient to pay
it off. The fraudulent representation regarding the amount of the deficit was of a present, not
future, fact. Wilkins's representation, in the August 1991 meeting, that he did not think CFH
could ever pay the deficit was an expression of an opinion regarding a future event based on
present facts and, therefore, supports CFH's fraud claim. 

 EDS also challenges the trial court's finding, in finding number 18, that EDS failed
to disclose material facts within its special knowledge. EDS argues that CFH, as originator
of the leases and collector of revenue, had all the lease accounting information it needed to
assess the lease portfolio. However, there is evidence showing that the lease tracking system
was the method of accounting for the lease revenues and that the system was operated solely
by EDS. CFH had access only to information that was given by EDS. Thus, there is
sufficient evidence to support the finding that EDS failed to disclose material facts within
its special knowledge. 

 Because a finding of fraud is sufficient to support the trial court's rescission of the
1991 release, we need not consider EDS's challenge to finding number 19 and conclusion
number 6 regarding duress and coercion. 

 We conclude that the evidence is sufficient to support the trial court's finding of fraud
in findings numbers 18 and 20 and that the clean-hands doctrine does not apply to these facts. 
We further hold that there is sufficient evidence to support the trial court's conclusion of law
number three that EDS's fraud caused CFH's damages. Therefore, the trial court did not err
in rescinding the release. 

 Accordingly, we overrule EDS's second issue. 

 C. Termination of the Partnership

 In its third issue, EDS contends that, because CFH was in default, the evidence is
legally and factually insufficient to support the trial court's findings that EDS wrongfully
terminated the partnership or that the amount of CFH's capital account, as defined by the
partnership agreement, was $1,140,220. EDS contends that CFH was in default under
paragraph 8.01(a) of the partnership agreement, which provided, as an event of default, "a
default by Partner A [CFH] in the payment of any obligations when due under this
Agreement." (5) 

 EDS does not direct us to any evidence in the record showing any unpaid obligations
under the agreement on December 28, 1990, the date EDS terminated the partnership. EDS
represented to CFH in a July 1990 meeting that CFH owed EDS $593,380, and EDS
presented a promissory note in that amount to Graves. Graves signed the note as president
of CFH and also signed a personal guarantee of the note. The note was to be paid in full by
October 1990, but CFH made no payments on it. The note was an obligation owed by CFH
to EDS, but it was not an obligation under the partnership agreement. Thus, EDS did not
establish that there were any unpaid obligations under the partnership agreement at the time
it terminated CFH's partnership interest. (6)

 There is sufficient evidence to support the trial court's finding that EDS breached the
partnership agreement by terminating the partnership on December 28, 1990. 

 Under its third issue, EDS also challenges finding of fact number 12, in which the trial
court found that CFH's future interest in the stream fees and residuals on the remaining
leases in the partnership was at least $1,659,087 and CFH's capital account in the partnership
as of December 31, 1990 had a book value of $1,140,229, for a total interest in the
partnership of $2,799,316, which the trial court found to be the actual damages to CFH
caused by EDS's breach of the partnership agreement. The sums found by the trial court
were based on supporting detail attached to EDS's K-1 report and a memorandum from
Wilkins to his superior regarding the financial status of the CFH portfolio. These documents
were generated by EDS and were introduced into evidence by CFH. EDS complains that the
trial court did not use the method of calculation set out in paragraph 3.03 of the partnership
agreement and that, using that calculation, there was no evidence to support the trial court's
finding that CFH's capital account was $1,140,229. 

 Paragraph 3.03 of the agreement provided for liquidation and distribution of the assets
at the end of the partnership term or when the partnership ended by vote or ceased to be a
going concern. In the event of CFH's default, the agreement provided for all assets and
interest in the partnership to be transferred to EDS. The agreement does not address the
results of default by EDS. In this case, the trial court was not entering a judgment for
liquidating and distributing the assets of the partnership. Rather, the court was awarding
damages based on EDS's fraud, negligent misrepresentations, and breach of fiduciary duty
as well as breach of the partnership agreement. Therefore, the trial court was not required
to determine the amount of CFH's damages by using the terms of the agreement, and there
is sufficient evidence to support finding of fact 12. 

 EDS also contends, in its third issue, that CFH is not entitled to recover attorney's fees
(as determined in conclusion of law number 9) because a request for an accounting does not
support an award of attorney's fees. However, CFH was not awarded relief on its request for
an accounting, but for breach of contract, fraud, and breach of fiduciary duty. The award for
breach of contract is sufficient to support the award of attorney's fees. See Tex. Civ. Prac.
& Rem. Code Ann. § 38.001 (Vernon 1997).

 We overrule EDS's third issue in its entirety. 


 D. The Lease Tracking System

 In its fourth issue, EDS contends that the trial court abused its discretion by admitting
evidence, which was not previously produced as required by court order, regarding the lease
tracking system. In response to the trial court's order to compel discovery, CFH produced
a list of 28 leases that it contended were not properly terminated on the lease tracking system. 
This list was admitted into evidence as defendant's exhibit 156. EDS complains that, in
addition to this list, the trial court admitted evidence of other alleged errors that CFH had not
previously disclosed. To support this complaint, EDS refers to a portion of the reporter's
record in which the trial court admits an audit-completion memorandum as plaintiff's exhibit
96, overruling EDS's objection to the relevance of the document. Assuming that plaintiff's
exhibit 96 is the evidence of which EDS complains, EDS's complaint on appeal does not
comport with its objection below and is, therefore, waived. See F.D.I.C. v. Golden Imports,
Inc., 859 S.W.2d 635, 641 (Tex. App.--Houston [1st Dist.] 1993, no writ). EDS also refers,
generally, to 75 pages of the record as showing other errors, but does not direct us to any
specific evidence improperly admitted in those pages. EDS does not address this issue with
any more specificity in its reply brief. Any complaint with regard to the referenced 75 pages
is waived for inadequate briefing. See RE/MAX of Texas, Inc. v. Katar Corp., 961 S.W.2d
324, 328 (Tex. App.--Houston [1st Dist.] 1997, pet. denied). 

 We overrule EDS's fourth issue. (7) 

 E. Sufficiency of the Evidence: EDS's Liability

 In its ninth issue, EDS contends there is no evidence, or insufficient evidence, to
support the trial court's liability findings against EDS. (8) We have already determined that the
evidence is sufficient to support the trial court's findings underlying its conclusion that EDS
breached the partnership agreement and made fraudulent misrepresentations to CFH. We
now consider whether there is sufficient evidence to support the trial court's findgs
underlying its conclusion that EDS breached its fiduciary duty to CFH. 

 Partners are charged with a fiduciary duty. Bohatch v. Butler & Binion, 977 S.W.2d
543, 545 (Tex. 1998). A fiduciary duty creates a special bond requiring the bound parties to
deal fairly and in good conscience with each other. Kinzbach Tool Co. v. Corbett-Wallace
Corp., 160 S.W.2d 509, 513 (Tex. 1942). A partner may not use his position to gain a benefit
for himself at the expense of his partners. Pickens v. Hope, 764 S.W.2d 256, 267 (Tex.
App.--San Antonio 1988, writ denied). 

 In this case, there was evidence that EDS knowingly used inaccurate information from
its lease tracking system to claim falsely a large deficit owed by CFH. EDS then used the
alleged deficit to persuade CFH to execute a mutual release in which EDS would retain all
the assets in return for releasing CFH from its alleged debt. In addition, there is evidence
that EDS retained funds from payments from a lessee who made payments on a lease that
was not a part of the partnership, but was owned separately by CFH. 

 We hold that, under these facts, there is sufficient evidence to support the trial court's
findings underlying its conclusion that EDS breached its fiduciary duty to CFH. 

 Because we have determined that there is sufficient evidence to support the trial
court's findings related to its conclusions that EDS breached the partnership agreement,
committed fraud against CFH, and breached it fiduciary duty to CFH, we overrule EDS's
ninth issue. 

 F. CFH's Damage Award: Measure of Damages

 In its fifth issue, EDS contends that the trial court erred by awarding CFH $2,799,316
in damages because it used the wrong measure of damages in valuing the partnership's assets
and CFH's interest in the assets and in calculating the damages award. Under this issue, EDS
challenges finding of fact 11 and conclusions of law 2 and 7. 

 In finding 11, the trial court found that, because of EDS's breach of the partnership
agreement, CFH was entitled to recover the value of its total interest in the partnership as
represented by the book value of its capital account and the present value of the future lease
stream fees and residuals it would have received under the partnership agreement, as of
December 31, 1990. The trial court concluded that EDS breached the partnership agreement
and CFH suffered actual damages of $2,799,316 as a consequence of the breach, as well as
the fraud, negligent misrepresentations, and breach of fiduciary duty by EDS. 

 EDS contends that the partnership property should have been liquidated as required
under Article XII of the partnership agreement, but that CFH did not offer sufficient evidence
to support such an award and did not offer any evidence of fair market value of the
partnership assets, as mandated by Article XII. Article XII provides as follows:

LIQUDATION


 12.01 Liquidation. The Partnership shall liquidate at the end of the
Partnership term, or upon a Partnership Vote or at any time it ceases to be a
going concern. Upon liquidation of the Partnership for any reason, the
Partnership shall engage in no further business other than such business as may
be necessary to wind up its affairs and distribute its Assets. Such winding up
shall be handled by a Partner chosen by Partnership Vote as Liquidating
Trustee. 


 12.02 Disposition of Assets. Upon liquidation of the Partnership, the
Partnership Assets shall be distributed to the extent sufficient assets are
available in accordance with the following provisions:


 (a) Final Statement of Account. As promptly as possible after
liquidation, the Liquidating Trustee shall prepare a final statement of
account which shall show the status of each Partner's Capital Account
and the amount, if any, that each Partner owes to the Partnership. The
final statement of account shall also reflect the allocation of gain and
loss described below. 


 (b) Determination of Partnership Assets. The Liquidating
Trustee shall determine the interest of the Partnership in each remaining
Partnership Asset. 


 (c) Valuation of Partnership. The Liquidating trustee shall
determine the fair market value of the remaining Partnership Assets
using appraisal techniques which he deems to be appropriate. Any
difference between the fair market value of such properties and the
basis of such properties as carried on the books of the Partnership shall
be allocated among the Partners pursuant to Article IV as though such
assets had been sold for cash. 


 Article XII governs the liquidation of the partnership at the end of the partnership term
(30 years), or upon a partnership vote (by holders of a majority of the partnership
percentages, i.e., EDS), or anytime the partnership ceased to be a going concern. Article XII,
by its own terms, applies to a liquidation by the partnership, not to a lawsuit for damages for
breach of the partnership agreement. 

 EDS argues, in the alternative, that sections 38 and 42 of the now-expired Texas
Uniform Partnership Act (TUPA) (9) apply and that CFH did not plead for recovery or present
sufficient evidence of damages under either of those sections, and the trial court did not make
findings of damages under those sections. 

 Prior to the expiration of TUPA on January 1, 1999, section 38 governed the rights
of partners to the application of partnership property upon dissolution of the partnership. Act
of May 9, 1961, 57th Leg., R.S., ch. 158, sec. 38, 1961 Tex. Gen. Laws 289, 300, expired
January 1, 1999, Act of May 31, 1993, 73rd Leg., R.S., ch. 917, § 2, Sec. 47, 1993 Tex. Gen.
Laws 3887, 3913. It provided for the rights of the partners to the partnership property when
the dissolution was under the terms of the partnership agreement and when it was in
contravention of the agreement. Id. Section 42 provided for the rights of retiring partners
or the estate of deceased partners when the business was continued. Id. at ch. 158, sec. 42,
1961 Tex. Gen Laws at 303. 

 EDS cites Rodgers v. RAB Investments, Ltd., 816 S.W.2d 543 (Tex. App.--Dallas
1991, no writ) (suit for partition of partnership property or judgment of dissolution and
winding up of affairs), and Cauble v. Handler, 503 S.W.2d 362 (Tex. Civ. App.--Fort Worth
1973, writ ref'd n.r.e.) (suit for accounting of partnership assets), in support of its argument
that CFH's remedy is under TUPA. Unlike in Rodgers, CFH did not sue for partition of the
partnership property or a judgment of dissolution and a winding up of partnership affairs. 
See Rodgers, 816 S.W.2d at 546. Likewise, unlike in Cauble, CFH did not sue only for an
accounting of the partnership assets. See Cauble, 503 S.W.2d at 363. CFH pleaded
numerous causes of action, including partnership accounting, breach of contract, breach of
fiduciary duty, fraud, negligence and negligent misrepresentation, duress, and usurpation of
partnership opportunities. CFH prayed for relief that included recovery of all its actual and
consequential damages, including, but not limited to, lost profits, lost business opportunities,
loss of business good will, and loss of reputation, as well as consequential damages resulting
from EDS's breach, and a constructive trust over all monies and assets, and other profits
received by EDS due to its wrongful acts. There is nothing in sections 38 or 42 to provide
for the causes of action pleaded by CFH. Therefore, TUPA does not apply to CFH's causes
of action. 

 EDS also contends that the trial court used the wrong measure of damages by
awarding CFH the value of CFH's GAAP (generally accepted accounting principles) capital
account as shown on its K-1 form ($1,140,229) and the present value of future lease stream
fees and residuals CFHI would have received, as of December 31, 1990, under the
partnership agreement ($1,659,087), for a total award of $2,799,316. EDS complains that
the only source of the $1,659,087 award was the Wilkins memorandum and that the
memorandum represents a gross amount rather than a net amount. Wilkins testified that his
calculations were based on the gross residual/stream fees. 

 The Wilkins memorandum was written after August 30, 1991 when Wilkins and two
other EDS employees met with Graves to persuade Graves to sign the release that would
transfer all CFH's partnership interest to EDS. The memorandum expressed the intention
to take the lease portfolio from CFH and bring it under EDS's management. The
memorandum showed a deficit for CFH of $1,013,693, a total tax capital account of
$717,735, and the present value of CFH's residual/stream fees at $1,659,087. According to
the memorandum, the overall reserve in CFH's favor was $1,363,129. The memorandum
also stated that the portfolio contained about 1800 leases with a receivable of nearly
$9,500,000. Nothing in the memorandum indicated that the $1,659,087 was a gross figure,
and $1,659,087 was used to calculate the overall reserve in CFH's account. The trial court
could have reasonably concluded that $1,659,087 represented the present value of the net
residual/stream fees that would be paid to CFH. 

 EDS also argues that, according to the partnership agreement, capital accounts were
to be calculated using a tax basis rather that using GAAP. However, Bob Buddendorf,
EDS's corporate representative and a certified public accountant, testified that the GAAP
capital account would reflect a partner's interest in the partnership. 

 EDS complains that the trial court awarded the residuals/stream fees twice--once as
part of the GAAP capital account and a second time as part of the residuals and stream fees. 
Buddendorf testified, "[T]he book capital account does include a component representing the
earned income attributable to expected residuals to be earned at the end of the lease term. 
To the extent that the residual and stream fees which are present valued here includes 100
percent of the expected residuals, then I think there is some double counting. . . . And, if, as
I say, you are discounting back to get a present value of all future stream fees and all 100
percent of the expected residuals, then there would be doubling counting, in my opinion." 
Buddendorf admitted that he did not make the calculations on the Wilkins memorandum and
that, if Wilkins separated the earned and unearned portion of the fees, there would not be
double counting. 

 The Wilkins memorandum had separate calculations for the capital account, consisting
of CFH's tax capital account and the book/tax difference, and the present value of CFH's
residual/stream fees. Because these calculations were performed by EDS, the trial court
could have found that the residual/stream fees were not counted twice. 

 We overrule EDS's fifth issue. 

 G. Prejudgment interest on lost profits

 In its sixth issue, EDS contends the trial court erred by awarding CFH both lost profits
and interest on the value of its capital account, challenging findings 11 and 12 and
conclusions 2 and 7. EDS argues that, under TUPA section 42, CFH had to make an election
between prejudgment interest and lost profits and could not recover both. See Act of May
9, 1961, 57th Leg., R.S., ch. 158, sec. 42, 1961 Tex. Gen. Laws 289, 303.

 Section 42 provided for the distribution of a partner's interest in a partnership upon
the retirement or death of that partner when the remaining partners continued the business
of the partnership. See Rodgers, 816 S.W.2d at 548; Cauble, 503 S.W.2d at 366. The EDS-CFH partnership was not dissolved as a result of the retirement or death of a partner;
therefore, section 42 does not apply. 

 The trial court found that EDS breached the partnership agreement on December 28,
1990 and awarded damages based on CFH's interest in the partnership as of December 31,
1990. However, the judgment was not signed until May 15, 2000. The trial court did not err
in awarding both CFH's lost profits and prejudgment interest on CFH's damages award. 

 Accordingly, we overrule EDS's sixth issue. 

 H. EDS's Prejudgment Interest Award

 In its seventh issue, EDS contends that the trial court erred by not awarding EDS the
full amount to which it was entitled in prejudgment interest on its damages, challenging
findings 26 and 27 and conclusions 8 and 15. EDS argues that it should have been awarded
prejudgment interest at the contract rate of 13% on the promissory note from July 20, 1990
until the date of judgment. In addition, EDS argues that no prejudgment interest was
awarded on the $8,000 conversion award, and that prejudgment interest should have been
awarded on the $8,000 conversion award from May 28, 1993, the date of the conversion,
until the date of judgment. 

 In calculating the amount of the judgment, the trial court awarded prejudgment
interest to EDS at 13% on the promissory note from July 30, 1990 (date of the note) to
December 31, 1990 (date of the breach). The trial court then evidently offset the amount of
the promissory note owed by CFH against the amount of the total award to EDS as of the
date of the breach for the purpose of calculating prejudgment interest. After the offset, the
court awarded prejudgment interest at 10% on $105,275.78 of the converted funds from
December 31, 1990 until judgment. The trial court could have concluded that, because EDS
had funds belonging to CFH in excess of the amount of the note, the interest on the note
should stop running at the time of the breach. Therefore, we hold that the trial court did not
err in its award of prejudgment interest on the promissory note.

 The $8,000 conversion award was not included in the portion of the award on which
prejudgment interest was awarded. EDS should have received interest on an additional
$8,000 from May 28, 1993 until the date of judgment. We hold that the trial court erred in
not awarding EDS this prejudgment interest on the conversion award. 

 We overrule EDS's seventh issue as it relates to interest on the promissory note and
sustain the issue as it relates to prejudgment interest on the $8,000 conversion award.

 I. Beginning Date for CFH's Prejudgment Interest

 In its eighth issue, EDS argues that CFH's prejudgment interest should begin to run
on May 15, 2000, the date of judgment, because interest on partnership accounts begins to
accrue when an accounting is had and the balance is ascertained. 

 There is no evidence of an accounting or that the award to CFH was the result of an
accounting of the partnership assets. The judgment in favor of CFH was based on the trial
court's finding that CFH suffered actual damages as the result of EDS's breach of the
partnership agreement. Therefore, the trial court did not err in awarding prejudgment interest
beginning January 27, 1991. Accordingly, EDS's eighth issue is overruled. 

 J. CFH's fiduciary duty to EDS

 In its tenth issue, EDS contends that the trial court's refusal to find that CFH owed a
fiduciary duty to EDS and that CFH breached that duty is erroneous as a matter of law and
against the great weight and preponderance of the evidence because (1) partners owe a
fiduciary duty to each other and (2) the trial court's findings (presumably those concerning 
the conversion of funds) show that CFH breached its fiduciary duty to EDS. 

 Assuming without deciding that EDS established conclusively that CFH breached its
fiduciary duty to EDS, EDS has obtained all the relief requested. In EDS's request for
additional findings of fact, it requested a finding that CFH breached its fiduciary duty to EDS
and that the breach caused damages to EDS of $105,275.78. That amount was awarded to
EDS as damages for conversion rather than for breach of fiduciary duty. Therefore, any error
by the trial court in refusing to find a breach of fiduciary duty is harmless. Tex. R. App. P.
44.1. 

 Accordingly, we overrule EDS's tenth issue. 

 

K. Failure to Set Off the Mutual Judgments

 In its eleventh, EDS complains that the trial court should have set off the mutual
judgments, citing Bonham State Bank v. Beadle, 907 S.W.2d 465 (Tex. 1995). 

 In Beadle, the issue involved two different judgments, a North Carolina judgment in
favor of Bonham State Bank and a Texas judgment in favor of Beadle. Id. at 466. The
supreme court recognized the power of the courts to set off mutual judgments. Id. at 468
(citing Simpson v. Huston, 14 Tex. 476, 481 (1855)). The court nted, as a problem when the
judgments are not offset, the possibility that an impecunious judgment creditor would
execute on the judgment it holds, then be unable to satisfy the judgment held by the other
party. Id. at 469. 

 In Beadle, it was necessary for Bonham State Bank to institute a declaratory judgment
action to obtain a setoff because there were two separate judgments. Id. at 467. We see no
reason why the reasoning in Beadle should not apply to mutual awards within one judgment. 
CFH's concern that the judgment amounts awarded each party be kept separate is well taken. 
However, that may be accomplished in the recitation of the awards in the judgment before
the setoff is made. The parties should not be required to institute a new lawsuit to obtain a
setoff. 

 Accordingly, EDS's eleventh issue is sustained. 

 L. The Take-Nothing Conclusion Regarding Graves and CFI

 In its twelfth issue, EDS contends that the trial court should not have concluded that
EDS take nothing on its claims against Graves and Corporate Funding, Inc. (a separate
corporation from Corporate Funding-Houston, Inc.). Graves and Corporate Funding, Inc.
were not parties to this lawsuit, and they do not appear in the judgment. 

 The trial court's conclusion of law 20 concluded, "ANLC and EDS take nothing on
all of their counterclaims against Glen Graves and Corporate Funding, Inc." EDS's fifth
amended original answer and counterclaim named only CFH as a counter-defendant. Graves
and Corporate Funding, Inc. were not parties to this lawsuit, and the trial court's conclusion
that EDS take nothing against them was erroneous. However, this take-nothing conclusion
was not entered into the judgment, so the error was harmless. If a conclusion of law is
erroneous, but the judgment rendered was proper, the erroneous conclusion of law does not
require reversal. Sears, Roebuck & Co. v. Nichols, 819 S.W.2d 900, 903 (Tex.
App.--Houston [14th Dist.] 1991, writ denied).

 We overrule EDS's twelfth issue. 

II. CFH'S APPEAL

 A. The Conversion Judgment

 In its first issue, CFH contends that the conversion judgment in EDS's favor should
be vacated because there is no evidence, or factually insufficient evidence, to support the trial
court's finding that CFH converted EDS's funds. CFH argues that, as a matter of law, CFH's
failure to pay to EDS some of the monies received from the lease payments is not conversion. 
CFH cites Newsome v. Charter Bank Colonial, 940 S.W.2d 157 (Tex. App.--Houston [14th
Dist.] 1996, writ denied), for the proposition that money is subject to conversion only when
it is (1) delivered for safe keeping, (2) intended to be kept segregated, (3) substantially in the
form in which it is received or an intact fund, and (4) not the subject of a title claim by its
keeper. Id. at 161.

 In Newsome, the plaintiffs contended the bank was liable for conversion because the
bank violated a writ of garnishment by not impounding funds belonging to the judgment
debtor, but held in the name of third parties not named in the writ. Id. The court of appeals
concluded that the funds on deposit could not be converted. Id. at 161-62. The only funds
that could be a specific chattel and subject to a claim of conversion were those captured by
the writ of garnishment served on the bank. Id. at 161. See also Eckman v. Centennial Sav.
Bank, 757 S.W.2d 392, 398 (Tex. App.--Dallas 1988, writ denied) (construction loan not a
specific fund; conversion claim fails); Wheat v. Am. Title Ins. Co., 751 S.W.2d 943, 944 n.1
(Tex. App.--Houston [1st Dist.] 1988, no writ) (non-payment of commission is debt to be
discharged, not conversion); Upper Valley Aviation v. Mercantile Nat'l Bank, 656 S.W.2d
952, 955 (Tex. App.--Dallas 1983, writ ref'd n.r.e.) (bank depositor may not sue in
conversion to recover deposit). 

 The funds at issue in this case were checks for rental fees mailed by the lessees to
CFH and deposited by CFH into CFH's Klein Bank account, in contravention of instructions
by EDS to deposit all such receipts in a partnership bank account that was under the sole
control of EDS. There was evidence that CFH used these funds to meet its payroll and pay
other business expenses. CFH does not contest that these funds belonged to the partnership,
although CFH contends that the amount deposited in the Klein Bank account was no more
than EDS should have paid to CFH, on an average, in stream fees. 

 Checks and the proceeds of checks may be the subject of conversion. See e.g.
Barraza v. Law Offices of Smith & Gopin, 918 S.W.2d 608, 611 (Tex. App.--El Paso 1996,
no writ) (proceeds of settlement check subject of conversion); Houston Nat'l Bank v. Biber,
613 S.W.2d 771, 774-75 (Tex. Civ. App.--Houston [14th Dist.] 1981, writ ref'd n.r.e.) (bank
converted two cashier's checks it was holding); Ward v. Shriro Corp., 579 S.W.2d 257, 260
(Tex. Civ. App.--Dallas 1978, no writ) (check, like other personal property, is subject to
conversion). Likewise, rental proceeds may be the subject of conversion. See, e.g., Hoenig
v. Tex. Commerce Bank, N.A., 939 S.W.2d 656, 664 (Tex. App.--San Antonio 1996, no writ)
(conversion claim involving rental proceeds); Allied Bank v. Plaza DeVille Assoc., 733
S.W.2d 566, 572-73 (Tex. App.--San Antonio 1987, writ ref'd n.r.e.) (same). 

 In the present case, the money deposited in the Klein Bank account was the proceeds
of rental checks delivered to CFH for the benefit of the partnership. These funds were
intended to be kept in a separate account--EDS's partnership account--until they were
swept by EDS into another account. These funds were not the subject of a title claim by CFH
because CFH was acting as an agent for the partnership. In addition, the funds so held by
CFH were not a debt CFH owed to EDS. We hold that, under these facts, the partnership
funds deposited in the Klein Bank account could be the subject of a claim for conversion. 
Moreover, the evidence that CFH used these funds for its own benefit supported the trial
court's finding that CFH converted the funds. 

 Accordingly, we overrule CFH's first issue. 


 B. Punitive Damages

 In its second issue, CFH contends that there can be no recovery of punitive damages
because there is no evidence of ill will or bad or evil motive. 

 To recover exemplary damages for conversion, the plaintiff must prove that the
defendant acted with malice. Green Int'l, Inc. v. Solis, 951 S.W.2d 384, 391 (Tex. 1997). 
"To establish malicious conversion, the plaintiff must show more than bad faith and wrongful
conduct; the plaintiff must show that the wrongful act was of a 'wanton and malicious
nature.'" Id. (quoting Ogle v. Craig, 464 S.W.2d 95, 97 (Tex. 1971)). 

 Vonda Rogers, documents manager for CFH, testified that she was told to take checks
from CFH's mailbox and give them to Hatler, a CFH employee who reported to Graves. She
was told that the money was needed for salaries and overhead. She testified that these checks
were removed from the mailbox on a regular basis from March to May 1991 and were
deposited in the Klein Bank account. She observed Hatler making out deposit slips for these
checks. When EDS discovered that checks were being deposited in an unauthorized bank
account, Graves had a secret meeting at his home after working hours. At that meeting were
Graves, Hatler, Randall Carr, and Rogers. Graves and Hatler said that EDS knew what they
had been doing and that someone "had to take the fall." They instructed Rogers to write a
statement that she was responsible for taking the checks and had done so to cover payroll and
expenses. Her statement said that she had suggested taking such action to Graves and Graves
had said emphatically that it was not to be done. She said she took the checks believing she
was helping the company. At trial, she testified that her written statement was false. 

 Carr, who did all of CFH's computer program maintenance, testified that he was
instructed by Graves to make CFH's computer appear to be broken so that the EDS employee
who began working in CFH's office would have to get her own computer. Carr testified that
Graves also asked him to make changes on reports showing the status of leases, called aging
reports, that would make the leases appear to be more current. Under CFH's agent
agreement, CFH was to buy back any leases that were more than 90 days in arrears. By
altering the aging reports, CFH could prevent or postpone buying back the leases. Carr's
testimony regarding the after-hours meeting at Graves's house corroborated Rogers's
testimony. 

 The testimony of Rogers and Carr was sufficient to support the trial court's finding
that CFH's conversion of EDS's funds was with malice. Accordingly, we overrule CFH's
second issue. 

 C. The Promissory Note

 In its third issue, CFH contends that the promissory note should be vacated because
there is a want of, or failure of, consideration and that without recovery on the promissory
note, there is no basis for the award of attorney's fees to EDS. 

 EDS responds that CFH has waived the affirmative defense of failure of consideration
because CFH did not request any findings on this defense. CFH argues that it properly
pleaded want of or failure of consideration and that the trial court's conclusion that EDS is
entitled to recover on the promissory note is an implicit denial of CFH's claim. 

 Lack of or failure of consideration is an affirmative defense. Tex. R. Civ. P. 94. 
Therefore, it was CFH's burden to plead, prove, and secure findings on its defense. CFH
pleaded the defense, and some evidence was introduced in support of that pleading. 
However, the record does not show that CFH requested the trial court to make a finding of
lack of or failure of consideration, nor does the record show an objection by CFH to the trial
court's failure to make such a finding. In CFH's response to EDS's request for findings of
fact and conclusions of law, CFH stated, "The Plaintiff does not agree with . . . Conclusions
of Law Nos. 12-18." However, CFH did not state any basis for its disagreement. Such a
general objection does not establish that CFH requested the trial court to make an additional
finding that there was no consideration, or that there was a failure of consideration, for the
promissory note. CFH has waived its complaint regarding want of or failure of
consideration.

 We overrule CFH's third issue. 


CONCLUSION


 We sustain in part EDS's seventh issue as it relates to prejudgment interest on the
$8,000 converted in 1993. We also sustain EDS's eleventh issue regarding a setoff of the
mutual judgments. We reverse the judgment insofar as those two issues affect it and remand
the cause to the trial court for calculation of the additional prejudgment interest and for
calculation of the setoff of CFH's award against EDS's award. In all other respects, we
affirm the judgment. 


 Sam Nuchia

 Justice


Panel consists of Justices Nuchia and Wilson. (10) 

The Honorable Murry B. Cohen, who sat on the original panel for this appeal, retired on May
31, 2002 and did not participate in this opinion. 


Do not publish. Tex. R. App. P. 47. 


1. Small ticket business equipment is equipment costing less than $100,000.
2. EDS does not indicate, in its brief, the amount EDS claimed CFH owed as of
December 28, 1990. 
3. EDS also retained some lease payments that were not subject to the partnership
agreement, but were the sole property of CFH. In an internal e-mail, EDS explained that
these funds would also be used to reduce CFH's deficit.
4. According to the evidence, the capital account was valued at either $717,735 as the
tax capital account or $1,140,229 as the GAAP capital account, and the present value of
CFH's share of residual and stream fees was $1,659,087. 
5. We decline to address EDS's challenges to findings of fact 14 and 21 and conclusions
of law 2, 7, and 8 because EDS does not specifically brief these challenges, with the
exception of one portion of finding 14. EDS challenges the trial court's finding, in finding
number 14, that EDS did not pay consideration for CFH's guarantee. This finding is
immaterial in light of the finding, also in finding number 14, that the "deficit" was an
obligation of the agent agreement and that there were significant questions whether any
deficit was actually owed. 
6. EDS refers to the partnership agreement, agent agreement, and SOPs jointly as "the
core agreements" and contends that the agreements must be construed together because they
were executed at the same time and that the partnership and agent agreements incorporate
the SOPs by reference. There is no language of incorporation in the agreements, and we find
nothing in the agreements to cause them to be construed as one instrument. In its challenge
to finding 14--that the alleged deficit was an obligation of the agent agreement, not the
partnership agreement--EDS does not direct us to any portion of the partnership agreement
that specifically imposed an obligation on CFH to pay money to EDS. The partnership
agreement required prompt payment of indebtedness "under or in connection with this
Agreement." Furthermore, there is conflicting evidence regarding whether CFH owed any
debt at the time EDS terminated the partnership. In the absence of any evidence of such
indebtedness, finding 14 is immaterial. 
7. Although EDS's fourth issue purports to challenge findings of fact 8, 9, 10, 13, 14,
and 16, EDS has not briefed its challenge to these findings. Therefore, any complaint
regarding these findings is waived. See Tex. R. App. P. 38.1(h); Emery v. Rollins, 880
S.W.2d 237, 238-39 (Tex. App.--Houston [1st Dist.] 1999, pet. denied). 
8. The ninth issue also purports to challenge damages, but EDS does not include
damages in the argument under this issue. See Tex. R. App. P. 38.1(h); Emery, 880 S.W.2d
at 238-29.
9. Tex. Rev. Civ. Stat. Ann. art. 6132b, Act of May 9, 1961, 57th Leg., R.S., ch. 158,
1961 Tex. Gen. Laws 289, expired January 1, 1999, Act of May 31, 1993, 73rd Leg., R.S.,
ch. 917, § 2, Sec. 47, 1993 Tex. Gen. Laws 3887, 3913. 
10. The Honorable Davie L. Wilson retired on March 30, 2002. Justice Wilson continues
to sit by assignment on this case, which was submitted on February 20, 2002.